## A01A2522. EVANS v. THE STATE.
### (558 SE2d 51)

ELDRIDGE, Judge.

A Fulton County jury found David Matthew Evans guilty of driving under the influence of alcohol — less safe driver; failure to maintain a lane; reckless driving; failure to use a turn signal; and improper lane change. He appeals, contending that the trial court erred in admitting the arresting officer's police report into evidence and that the trial court erred in refusing to permit his expert witness to extrapolate his blood alcohol content by applying the "Widmark formula" to the amount of alcohol Evans consumed. Upon review of the errors as enumerated, we affirm.

1. Evans claims

the trial court committed reversible error in admitting over defense objection officer Sears's police report when the defense had not made charges against the officer of improper influence, motive, or recent fabrication, the prosecution offered the police report solely to corroborate or bolster the officer's testimony, and the police report was not truly consistent with the officer's testimony.

We find no error in the admission of the police report.

Arresting Officer C. Sears was cross-examined extensively about the contents of her police report. Such examination began with the establishment of the necessity for accuracy in police reports:

And so, you know, in a — in a criminal case, DUI case, facts that — would you agree that facts that would be important would be facts that you observed that indicated to you that a person was under the influence of alcohol? . . . And you would put those facts in your report, right? . . . To the best of your ability. . . . Okay. But you're trained to put the important facts in. . . . I notice your report was very neat. It was typed up, so you do the best you can when you write your reports, right?

From this point on, Evans' defense attorney repeatedly questioned Sears about the validity of the contents of her report in relation to her trial testimony (Sears' responses are italicized):

Q. And I believe your report indicates that you stopped Mr. Evans at 10:17 p.m.; is that correct? . . . Would you like to look at your report and refresh your memory if you can't recall?

Q. Now, you have testified that he told you that he was drinking at the Taco Cabana. A. *He said we just came from the Taco Cabana and I've had a few, so I inferred from that that he'd been drinking at the Taco Cabana.* Q. [S]o you made an assumption — You made an assumption about what he meant, and you put in your police report "I believe that I asked him if he had been drinking, and he stated that he had just left Taco Cabana where he had only a few." . . . That's what you put in your report. . . . Okay. So in your report, you write that he told you he'd been drinking at the Taco Cabana, correct? . . . Take a look at your report, eight or nine lines down. "I asked him if he'd been drinking." Why don't you just read to the jury what you wrote in your report? . . . You didn't infer. You wrote that he told you that he had had a few at Taco Cabana. Do you agree with that? Or do you agree that's what you put?

Q. And there's nothing in your report that indicates any confusion on his part regarding that instruction and his ability to execute that maneuver, correct?

Q. So up to now he has been cooperative with you, but at this point you say [in your report] that he — he was refusing to

cooperate; is that what you're saying? *A. If that's what I wrote in my report, then yeah. It looked like he was refusing to cooperate.* Q. Now, when you say if you wrote that in your report, does that mean that you don't remember, but if you said it in your report, then that must be the way it was, or what are you saying?

Q. I believe in your report you said you released the vehicle to the sober passenger. . . . Is that right? . . . But you said you released — in your report you said "I released the vehicle to the sober — to the sober [sic] passenger."

Q. And I think he told you he'd been eating a taco. . . . It's in your report. And in fact it was some taco on his shirt; is that right? *A. Yeah, on his shirt, on his face, everywhere.* Q. Okay. Now, you didn't put it was on his face in your police report. Is that something you're just remembering right now? Okay. Well, are you taking back it was on his face and everywhere or what? Is that something you just made up now? . . . you didn't put that in your report.

Q. Okay. Now, the odor of alcohol, would you agree that's a pretty important indicator — of being under the influence of alcohol; is that right? And if a police officer in a DUI case notices an odor of alcohol coming from a suspect, that's something that you would generally put in a police report; is that right? . . . Yeah. Would you tell me whether it's in your report, or tell me where in your report you said that you smelled an odor of alcohol?

Q. Now, the report — the incident took place — well, you stopped him at 22:17, 10:17 p.m. on 6/17/2000, right? . . . And your report was — in the upper left-hand corner of the report on the first page, it says report date 6/19/2000 at 16:17 p.m., and then at the bottom of the report, it says signed date 6/20/2000 at 19:16, right? . . . So that — am I correct in concluding that you wrote the report on 6/19/2000 at 16:17 p.m.? . . . Okay. And 6/19 would have been about an hour — a couple of hours — looks like about six hours short of two days after you arrested Mr. Evans — that you wrote your report, according to your report. . . . Okay. You don't remember what happened. . . . But you don't dispute that the report was written about two days later.

Q. Okay. Now, after Mr. Evans declined, stood on his rights and declined to take the breath test — you knew that this

case was going to turn on your observations because there was not going to be a chemical test in evidence. . . . Do you agree with that? . . . So you knew that it would be important to get a conviction that you be able to testify in a manner that would carry the day; that would establish beyond a reasonable doubt that my client was DUI.

Thereafter, on redirect, the State introduced Sears' police report into evidence. Evans objected on the basis of hearsay and on the basis that the police report allegedly was not a prior consistent statement, but was inconsistent with Sears' trial testimony: "So, in this case, what we have [in] the police report is not a prior consistent statement in that regard; it's a prior inconsistent statement in that regard." The trial court admitted the police report over objection.

A review of Officer Sears' police report shows that it contains many facts consistent with her trial testimony and omits other facts to which she testified at trial. Regardless, we have no trouble in concluding that Evans' cross-examination of Officer Sears as reflected above made the contents of the officer's report relevant for the jury's consideration. Since the officer testified and was subject to cross-examination, her report was not hearsay.[1] Further, to the extent the report was a prior consistent statement as asserted by the State, it was admissible because Evans without a doubt called into question whether Sears' trial testimony was the result of recent fabrication in order to "carry the day" and secure a DUI conviction; thus, the State was entitled to rehabilitate Sears on redirect through the proof of the prior consistent statements contained therein.[2] To the extent the report was inconsistent with Sears' trial testimony by virtue of its omissions, as asserted by Evans, it was admissible as a prior inconsistent statement, and Evans can show no harm as such prior inconsistent statement would go to impeach Sears' allegedly fabricated trial testimony as per the gist of Evans' cross-examination.[3]

It is the province of the judge in all instances to determine the admissibility of evidence.[4]

The rule of evidence is, that when an admission, conversation or declaration previously made by a party or a witness

---

[1] *Harkness v. State*, 225 Ga. App. 864, 869 (6) (485 SE2d 810) (1997).

[2] *Woodard v. State*, 269 Ga. 317, 320 (496 SE2d 896) (1998); *Cuzzort v. State*, 254 Ga. 745 (334 SE2d 661) (1985); *Moon v. State*, 258 Ga. 748, 758 (28) (375 SE2d 442) (1988), rev'd on other grounds, *Zant v. Moon*, 264 Ga. 93 (440 SE2d 657) (1994); *Geoffrion v. State*, 224 Ga. App. 775, 778 (4) (482 SE2d 450) (1997), overruled on other grounds, *Mullins v. State*, 270 Ga. 450 (511 SE2d 165) (1999).

[3] *Woodard v. State*, supra at 318 (2); *Gibbons v. State*, 248 Ga. 858 (286 SE2d 717) (1982).

[4] *Hyman v. State*, 272 Ga. 492, 496 (531 SE2d 708) (2000).

is pertinent, the side tendering evidence as to the same is at liberty to prove such portion only thereof as is deemed material, and the other side may then bring out the whole of the admission, conversation or declaration, so far as so doing may be essential in order to arrive at the true drift, intent and meaning of what was said on the previous occasion.[5]

The contents of the police report constituted the testifying officer's declaration of what had occurred on the incident date, whether consistent or inconsistent with her trial testimony. Once an issue regarding the validity of the contents of the report was raised during cross-examination of the declarant officer, the State was allowed to introduce the report in its entirety to fully disclose the substance of the officer's declaration.[6] Accordingly, under the circumstances presented here, we find no error in the trial court's admission of the police report.

To the extent that Evans also attempts to assert a "continuing witness" objection with regard to the admission of the police report, such was not raised at trial and is thus waived.[7]

2. Evans contends that

the trial court committed reversible error in excluding the expert witness testimony of Dr. Citron regarding the absorption and elimination of alcohol in the human body, and the application of retrograde extrapolation based on the Widmark formula to a hypothetical based on evidence from two defense witnesses who were with Mr. Evans on the evening of his arrest.

We find no error in precluding this testimony for three reasons.

(a) As a defense tool, the "Widmark formula" reestimates a defendant's blood alcohol content in an attempt to negate the statutory inferences that arise under OCGA § 40-6-392 (b) when chemical testing of a defendant's blood, breath, or urine results in a charge for driving under the influence with an excessive blood alcohol content per OCGA § 40-6-391 (a) (5).[8]

Here, however, Evans was not so charged. On the incident date, Evans refused blood alcohol content testing, and he was charged

---

[5] (Citations and punctuation omitted.) *Fitzgerald v. State*, 201 Ga. App. 361, 363 (2) (411 SE2d 102) (1991).

[6] *Id.* at 363. See also *Brown v. State*, 270 Ga. 601, 605 (512 SE2d 260) (1999) (Hunstein, J., dissenting).

[7] *Sharpe v. Dept. of Transp.*, 270 Ga. 101, 103-104 (505 SE2d 473) (1998); *Griffin v. State*, 243 Ga. App. 282, 286 (531 SE2d 175) (2000).

[8] *Yount v. State*, 249 Ga. App. 563, 565 (548 SE2d 674) (2001).

solely under the "less safe" provisions of the Code, OCGA § 40-6-391 (a) (1). In that regard, the inferences addressed in OCGA § 40-6-392 (b) apply only where "the amount of alcohol in the person's blood at the time alleged [i]s shown *by chemical analysis* of the person's blood, urine, breath, or other bodily substance."[9] When chemical analysis of bodily substances is refused, the statutorily permitted inferences that arise from such chemical testing are irrelevant, and there is nothing for the defense to rebut by using the "Widmark formula."

Thus, absent the chemical analysis referenced in OCGA § 40-6-392 (b), an expert's testimony about Evans' blood alcohol content based upon the "Widmark formula" is irrelevant, and the only issue is whether Evans' driving ability was impaired by alcohol to the point he was "less safe" to drive. As was held by the Supreme Court of Georgia in *Kevinezz v. State*,[10] "[u]nder § 40-6-391 (a) (2) [DUI — less safe], impaired driving ability is an element of the crime that the state must prove to obtain a conviction."[11] In *Kevinezz*, the Court determined that DUI — less safe and DUI — excessive blood alcohol content are different methods of proving the offense of "driving under the influence," and indictment on one does not permit conviction on the other, since "such an indictment would not put a defendant on notice that he or she could be convicted under § 40-6-391 [(a) (5) DUI — excessive blood alcohol content], which [does] not contain the phrase 'under the influence' and [does] not require the state to prove impaired driving ability."[12] And of course impaired driving ability depends solely upon an individual's response to alcohol, regardless of his or her blood alcohol content: "A blood-alcohol level greater than .06 might not render one individual a less safe driver, whereas a blood-alcohol level below .06 might render another individual a less safe driver."[13]

Moreover, the General Assembly demonstrated a reasoned approach when it required under OCGA § 40-6-392 (b) that a person submit to a request for chemical testing of blood, breath, or urine before the statutory inferences can arise in a DUI trial. In this way, a defendant cannot refuse to submit to testing — thereby precluding a chemical analysis of blood alcohol content on certified equipment by certified operators as required by OCGA § 40-6-392 — and then later attempt to introduce evidence at trial of a *purported* blood alcohol content drawn solely from a hypothetical based upon defense evidence posed to a defense expert in order to take advantage of the

---

[9] (Emphasis supplied.) OCGA § 40-6-392 (b).

[10] 265 Ga. 78 (454 SE2d 441) (1995).

[11] Id. at 79 (2).

[12] (Citations omitted.) Id. at 82 (2) (b).

[13] *Bowden v. State*, 202 Ga. App. 802, 803 (2) (415 SE2d 527) (1992).

statutory inferences denied the other party by the defendant's refusal to submit to chemical testing. "The State and a criminal defendant should begin on a level playing field at the outset of trial."[14] A refusal to submit to chemical testing makes inferences related to blood alcohol content irrelevant, since the State must prove only that the defendant was less safe to drive, regardless of his or her blood alcohol content.

(b) Another reason the trial court was correct in refusing to permit the testimony of Dr. Citron concerning Evans' blood alcohol content is because there was no factual basis upon which to calculate such. Before this Court, Evans states that Dr. Citron applied the "Widmark formula" to the amount of alcohol Evans consumed on the night in question as testified to by defense witnesses, Tina Vincent and Clay Hambright. However, we have reviewed the testimony of both Vincent and Hambright. Vincent stated that Evans had only one tequila in a brandy snifter which he shared with others. She also testified that Evans had one beer. Vincent testified that Evans may have ordered another drink: "He may have. I don't — I don't remember that he did."

Hambright testified that Evans consumed more than one tequila: "There were more ordered, but I don't recall specifically if David himself ordered them, and — but there were more ordered and shared." Hambright testified that he did not count how many drinks were ordered or remember by whom, but thought "if you combined them, he [Evans] may have had one or two drinks." Hambright could not remember if Evans ordered a beer or not.

In light of the disparity between both witnesses' testimony concerning the amount of alcohol Evans consumed and the fact that both witnesses were unsure about the number of drinks ordered by Evans and consumed by him, there was an insufficient factual basis upon which Dr. Citron could accurately calculate Evans' blood alcohol content using the "Widmark formula": "There was no factual basis given for this calculation."[15]

(c) Finally, in his proffered testimony, Dr. Citron stated that the "Widmark formula" has a *20 percent* margin of error, thereby failing to establish the level of "verifiable certainty" producing "reliable results" which is required to make such a procedure admissible.[16] This is not a situation wherein a procedure that is otherwise accurate and reliable is subject to human error in its administration or interpretation, which would be the proper subject of cross-examina-

[14] (Citation and punctuation omitted.) *Dickerson v. State,* 241 Ga. App. 593, 598 (526 SE2d 443) (1999) (Blackburn, P. J., concurring specially).

[15] *Johnson v. State,* 261 Ga. 419, 420 (3) (405 SE2d 686) (1991).

[16] *Caldwell v. State,* 260 Ga. 278, 285-286 (393 SE2d 436) (1990).

tion.[17] Nor is the "Widmark formula's" margin of error sufficiently minimal so as to be considered "*some* margin of error [which] *may* give an erroneous result under certain circumstances."[18] Instead, the "Widmark formula," itself, produces inaccurate results to the extent of a 20 percentage point differential, plus or minus. We believe it is appropriate for the trial court to permit expert testimony utilizing the "Widmark formula" only when it is "demonstrated with verifiable certainty that [the Widmark formula is] an *accurate and reliable* means of ascertaining . . . a person['s blood alcohol content]."[19]

Accordingly, the trial court correctly concluded that Dr. Citron's testimony was inadmissible.

*Judgment affirmed. Andrews, P. J., and Miller, J., concur.*

DECIDED DECEMBER 14, 2001.

*Davis, Zipperman, Kirschenbaum & Lotito, Seth D. Kirschenbaum,* for appellant.

*Joseph J. Drolet, Solicitor-General, Julie A. Kert, Assistant Solicitor-General,* for appellee.

---

[17] See *Lattarulo v. State,* 261 Ga. 124, 126 (401 SE2d 516) (1991); *Hawkins v. State,* 223 Ga. App. 34, 38 (476 SE2d 803) (1996).

[18] (Punctuation omitted; emphasis supplied.) *Haynes v. State,* 244 Ga. App. 79, 80 (534 SE2d 807) (2000); *Newton v. State,* 191 Ga. App. 664 (382 SE2d 432) (1989).

[19] (Emphasis supplied.) *Harper v. State,* 249 Ga. 519, 526 (1) (292 SE2d 389) (1982).