A05A0609. BOLLINGER v. THE STATE.
(613 SE2d 209)

PHIPPS, Judge.

William Bollinger appeals from his convictions for obstructing an officer, stalking, and influencing a witness (three counts), asserting that the trial court erred by: (1) finding he knowingly and intelligently waived his right to counsel; (2) failing to sustain a continuing witness objection; and (3) failing to merge two of his influencing a

witness convictions. Because we find that Bollinger's claims of error have no merit, we affirm.

1. Bollinger contends he did not knowingly and intelligently waive his right to counsel because the trial court did not: (1) discuss that he "would be required to make strategic decisions as to voir dire and striking jury members"; (2) mention that he would make decisions about which witnesses to call; (3) make it clear that certain issues must be properly preserved for appeal; and (4) go over the specific defenses available to him.

> The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. . . . [T]he trial judge has the responsibility of determining whether the accused has intelligently waived his right to counsel. The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused — whose life or liberty is at stake — is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused.[1]

Generally, in order to validly waive the right to counsel, the defendant should understand: (1) the nature of the charges; (2) any statutory lesser included offenses; (3) the range of possible punishments, including a jail sentence; (4) possible defenses; (5) mitigating circumstances; (6) that the rules of evidence will be enforced against him; (7) that he must make strategic decisions about testifying, calling witnesses, conducting voir dire, and striking jurors; and (8) that issues must be preserved and transcribed in order to make them on appeal.[2] However, our Supreme Court has emphasized "that it is not incumbent upon the trial court to make each of these inquiries."[3] Instead, "[t]he record need only reflect that the accused was made aware of the dangers of self-representation and nevertheless made a knowing and intelligent waiver."[4] Thus, "[c]ontrary to the implication in some appellate decisions, the warnings required to meet constitutional muster need not take any rigid form, and specific questions need not

---

[1] (Citations and punctuation omitted.) *Clarke v. Zant*, 247 Ga. 194, 196 (275 SE2d 49) (1981).

[2] *Bush v. State*, 268 Ga. App. 200, 202 (2) (601 SE2d 511) (2004).

[3] *Jones v. State*, 272 Ga. 884, 886 (2) (536 SE2d 511) (2000).

[4] (Citation and punctuation omitted.) Id.

be asked on the record."[5]

Here, the record shows that shortly before the trial began, Bollinger's appointed counsel announced that although he had assisted Bollinger with pretrial matters, Bollinger had informed the court in pretrial that he wanted to represent himself during trial. A transcript of the pretrial conference is not in the record before us, but the trial court's statements made on the record at trial indicate Bollinger may have been warned about the dangers of self-representation at the pretrial conference. Before the start of his trial, the court confirmed that Bollinger still planned to represent himself at trial, even though a public defender had been appointed to represent him. The trial court explained that the public defender would be available to assist Bollinger throughout the trial. The trial court then asked the public defender to review the charges with Bollinger, explain the amount of jail time he could receive for each charge, and go over the jury selection process with him. Bollinger admitted that this information had already been provided to him and the public defender agreed to explain it to him again.

After a ten-minute recess, the trial court explained to Bollinger (1) that he would be held to the same standard of skill and knowledge as a lawyer during the trial; (2) the jury selection process; (3) that he could ask the public defender for advice during jury selection; (4) that he had the right to an attorney and that one would be appointed if he could not afford one; (5) that he would be much better off with counsel representing him; and (6) that he may have defenses that would be better handled by an attorney. The trial court also went over each charge against Bollinger and the maximum and minimum sentences. During the course of his colloquy with the trial court, Bollinger acknowledged that he had already discussed the questions he planned to ask potential jurors with his public defender. After explaining Bollinger's rights to him at length, the trial court concluded that he understood the perils of representing himself and knowingly chose to do so.

Before the trial began, it was brought to the attention of the trial court that Bollinger had previously requested assistance from his public defender in subpoenaing witnesses, but failed to provide the names of these witnesses to the public defender when requested to do so. The trial court then asked Bollinger if he had any motions to make with regard to the availability of witnesses and Bollinger responded in the negative. Before allowing Bollinger to proceed with his opening statement, the trial court confirmed outside the presence of the jury that the public defender had informed Bollinger about how to make

---

[5] *Hightower v. State*, 252 Ga. App. 811 (557 SE2d 434) (2001).

an appropriate opening statement. During his cross-examination of the victim, the trial court sent the jury out for a break and asked the public defender to talk with Bollinger about proper cross-examination. After Bollinger discussed this with the public defender, the trial court also provided him with instruction.

At the conclusion of the state's case and before the recess at the end of the day, the trial court reminded Bollinger that he needed to decide overnight whether or not he would testify or present any other evidence, asked him to discuss it with the public defender, and cautioned that he would not be allowed to bring in new evidence during his closing argument if he decided against testifying. The next morning, the trial court questioned and instructed Bollinger at length about his decision to testify, the procedure for his testimony, his right not to testify, the state's burden of proof, and the dangers of testifying in general and without the benefit of counsel.

After Bollinger testified, he informed the court that he had no other witnesses and wanted to rest his case. Before proceeding with a charge conference, the trial court instructed Bollinger outside the presence of the jury to discuss with the public defender the ramifications of resting his case. Bollinger then confirmed that he would rest his case.

During the charge conference, Bollinger consulted with the public defender, reserved his objections, and objected to letters being sent out to the jury that had already been read into evidence. Before allowing Bollinger to make his closing argument, the trial court instructed Bollinger to talk with the public defender about what he planned to say. Finally, when the trial court completed its charge of the jury, Bollinger reserved his objections to the charge as given.

Based on the facts and circumstances of this case, we cannot say that the trial court clearly erred by finding that Bollinger knowingly and intelligently waived his right to counsel.

> The record shows with convincing clarity that the defendant knowingly, understandingly and voluntarily waived the right of representation by counsel. In an effort to protect appellant's rights, the trial court appointed an attorney when requested by the accused; the attorney discussed the case with appellant, and was asked by the court to assist him in his self-representation. Appellant made a decision to represent himself in this case. This is not a case where the defendant stood trial alone with no assistance or protection

of his rights.[6]

As we have previously stated, the fact that the trial court did not make an inquiry on the record into every single area previously outlined by our courts, does not mandate a different result.[7] Additionally, contrary to Bollinger's assertions, the transcript shows that he clearly understood he would make decisions about which witnesses to call and the voir dire process. Moreover, although there was no explicit discussion in the record before us of possible defenses and the need to preserve error for appeal, it is apparent that Bollinger frequently discussed his case and trial strategy with the public defender and had clear ideas about how to defend himself. Likewise, with regard to the need to preserve error for appeal, Bollinger's exceptions to the charge and objections to exhibits going out with the jury demonstrate that he understood the need to preserve his objections.

2. Bollinger asserts the trial court erred by allowing four letters to go into the jury room over his continuing witness objection. According to Bollinger, these letters were subject to a continuing witness objection because the victim read the letters out loud during direct examination by the state.

> In Georgia the "continuing witness" objection is based on the notion that written testimony is heard by the jury when read from the witness stand just as oral testimony is heard when given from the witness stand. But, it is unfair and places undue emphasis on written testimony for the writing to go out with the jury to be read again during deliberations, while oral testimony is received but once.[8]

In this case, the letters were not written testimony. The letters were original documentary evidence of Bollinger's attempt to influence witnesses.[9] As a result, the trial court's submission of the letters to the jury did not violate the continuing witness rule.[10]

---

[6] (Citations and punctuation omitted.) *Williams v. State*, 192 Ga. App. 317, 318-319 (2) (384 SE2d 877) (1989).

[7] See *Jones*, supra.

[8] (Citations and punctuation omitted.) *Hinton v. State*, 233 Ga. App. 213 (1) (504 SE2d 49) (1998).

[9] See *Vinyard v. State*, 177 Ga. App. 188, 190 (1) (338 SE2d 766) (1985) (submitting to jury letter sent from prison did not violate continuing witness rule); *Johnson v. State*, 234 Ga. App. 58, 60 (2) (506 SE2d 212) (1998) (proscription against allowing jury to possess written testimony during deliberations does not extend to documents that are relevant and admissible as original documentary evidence in the case).

[10] *Johnson*, supra.

3. Bollinger argues the trial court should have merged his convictions on Counts 3 and 4 of the indictment for purposes of sentencing. Count 3 of the indictment charged that "on or about the 9th day of January, 2001," Bollinger directly communicated an offer of a benefit, reward and consideration to the victim with the intent to deter her as a witness from testifying freely, fully and truthfully. Count 4 of the indictment charged that "on or about January 9, 2001," Bollinger directly communicated a threat of injury or damage to the victim with the intent to deter her as a witness from testifying freely, fully and truthfully.

In support of his argument that these two counts should merge, Bollinger points to a letter he mailed to the victim on January 9, 2001, which was introduced into evidence by the state. In this short, handwritten letter, Bollinger wrote:

> I *promise* to leave you alone *forever*. No more letters or notes after this one. You will *never* see me again. And I will be no more trouble for you. Whether or not you believe this I care about you. I hope despite everything you care about me. I do ask for 2 requests granted. (1) that you and Preston do not show up for my trial. (2) request I will let you know after the trial. I do hope you honor my requests and make this split in our relationship peaceful and friendly.

Bollinger argues that the state used the statement, "I promise to leave you alone forever" to support Count 3 (offer of a benefit) and the statement, "I do hope you honor my requests and make this split in our relationship peaceful and friendly" to support Count 4 (threat of injury). Bollinger argues that since these statements were made in one letter, addressed to one witness, and communicated at the same time, they merge for purposes of sentencing.[11]

The state argues that the convictions on Counts 3 and 4 of the indictment do not merge because other evidence supports these convictions; thus, its case does not depend solely on the January 9, 2001 letter. The state argues that because the date of January 9, 2001, in the indictment was not material, it can prove these counts with letters sent on other dates within the statute of limitation and before the indictment was issued.

> The general rule is that when the exact date of a crime is not a material allegation of the indictment, the crime may be

---

[11] See *Taylor v. State*, 238 Ga. App. 753 (520 SE2d 267) (1999) (DUI convictions merged when defendant violated DUI statute in more than one way in single act of driving).

proved to have taken place on any date prior to the return of the indictment, so long as the date is within the applicable statute of limitation.[12]

A date is material if it is an essential element of the charged offense or if a defense, such as alibi, is asserted that makes the date of the offense material.[13] Here, the date of the offense is not an essential element of influencing a witness,[14] and Bollinger's defense was that he did not write any of the 11 letters introduced into evidence by the state. Thus, Bollinger's defense did not render the date in the indictment material and the variance between the date in the indictment and the proof at trial was not prejudicial to his defense. Finally, Bollinger was not surprised by the introduction of the other letters as the indictment stated the offenses occurred on or about January 9, 2001.[15]

Having determined that the date in the indictment was not material, we must now decide if any other letters support Bollinger's conviction on Count 4 as alleged by the state. In a letter sent on January 13, 2001, Bollinger wrote the victim that she made a big mistake when she turned his letters over to the police, that he planned to represent himself at trial and ask questions about skeletons in her closet that would ruin her reputation, that "[i]n the long run if this goes to trial it is going to get ugly," that he did not want a war with her, but if she pushed him "so be it," that he planned to get out of jail soon and would come see her so they could end their relationship "peacefully, quietly and without anyone getting hurt." After telling her it would get ugly if the case went to trial, Bollinger asked the victim to please not make him do this to her. We find this letter sufficient to independently support Bollinger's conviction on Count 4 of the indictment. As a result, the trial court did not err by failing to merge Counts 3 and 4 for purposes of sentencing.

*Judgment affirmed. Andrews, P. J., and Mikell, J., concur.*

DECIDED APRIL 8, 2005.

*Emily J. Gilbert,* for appellant.

---

[12] (Citations and punctuation omitted.) *Evans v. State,* 246 Ga. App. 895 (2) (543 SE2d 37) (2000).

[13] See *Wilt v. State,* 265 Ga. App. 158, 161 (2) (592 SE2d 925) (2004).

[14] See OCGA § 16-10-93.

[15] Compare *Brown v. State,* 190 Ga. App. 678-679 (1) (379 SE2d 598) (1989) (indictment did not contain "on or about" language putting defendant on notice that time period in question might vary).

*Jeffrey H. Brickman, District Attorney, Robert M. Coker, Barbara B. Conroy, Assistant District Attorneys*, for appellee.