## A09A0359. VARNER v. THE STATE.

(678 SE2d 515)

MILLER, Chief Judge.

A DeKalb County jury convicted Victor Varner of one count of armed robbery (OCGA § 16-8-41). Varner appeals from the trial court's order denying his motion for a new trial, contending that his constitutional rights were violated because (1) the State failed to disclose a deal with Varner's accomplice and elicited misleading testimony from her at trial and (2) his trial counsel rendered ineffective assistance by failing to adequately cross-examine his accomplice. Varner further argues that the trial court erred in (1) admitting a letter his accomplice received in jail without proper authentication that he was the author; (2) allowing the jury to review that letter and another letter in the courtroom after deliberations began; and (3) admitting the victim's in-court and out-of-court identifications. Finally, Varner challenges the sufficiency of the evidence. Discerning no error, we affirm.

Viewed in the light most favorable to the verdict (*Drammeh v. State*, 285 Ga. App. 545, 546 (1) (646 SE2d 742) (2007)), the record shows that on January 7, 2002, Varner and his accomplice, Jessica Bails, who was 16 years old and working as a prostitute, decided to rob one of Bails' customers. At approximately 1:30 a.m., Bails solicited Larry Bentley at a gas station, and the two got into Bentley's car and drove to an automated teller machine (ATM) and then to a local hotel. When they drove into the hotel parking lot, Varner, accompanied by another man (the "second accomplice"),[1] approached the car, opened the driver's side door, and holding a gun to Bentley's head, demanded that Bentley get out of the car, lie on the ground, and give him his money. When Bentley told him he did not have any money, Varner kicked Bentley several times. In the meantime, Bails and the second accomplice went through Bentley's car, where they found Bentley's credit cards and a payroll check. Bails cleared out Bentley's trunk, throwing a green duffel bag on the ground in the parking lot.

With Bails driving and Varner still holding his gun, the three perpetrators drove Bentley to a check-cashing store. When they arrived, Varner gave the second accomplice his gun, and the second accomplice, concealing the gun under his jacket, accompanied Bentley into the store while Bentley cashed the payroll check. Over the course of several hours, the perpetrators drove Varner to six or seven ATMs and withdrew approximately $600 using Varner's credit cards.

---

[1] The second accomplice was never identified or arrested.

800

The perpetrators made Bentley ride in the trunk several times. At some point, Varner gave the second accomplice some money and let him out of the car.

Varner and Bails eventually drove back to the gas station where Bentley had first encountered Bails. When Varner and Bails went inside the store, Bentley escaped, ran across the street to another gas station, and asked someone to call the police. The responding officer drove Bentley back to the hotel parking lot, where Bentley recovered his duffel bag and some other belongings. When the police located Bentley's car, it had been wrecked. In the course of their investigation, the police lifted latent fingerprints from Bentley's vehicle, which were subsequently identified as belonging to Shannon Driscoll, one of several aliases Bails used.

Police arrested Bails several days after the robbery. After she was advised of her *Miranda* rights, Bails gave a statement under the name of Shannon Driscoll detailing the events of January 7. Bails was indicted on counts of armed robbery, aggravated assault, kidnapping, and possession of a firearm during the commission of a felony, and on August 2, 2002, she pled guilty to armed robbery and kidnapping and received concurrent sentences of ten years in prison. In or around August 2003, Bails' counsel filed a motion to modify her sentence. After Bails testified against Varner at his 2006 trial, her counsel filed an unopposed motion to vacate her convictions, and she was re-sentenced to five years imprisonment, with credit for time served, and five years probation.

1. Varner claims that the State violated his constitutional rights under *Napue v. Illinois*, 360 U. S. 264 (79 SC 1173, 3 LE2d 1217) (1959), *Brady v. Maryland*, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963), and *Giglio v. United States*, 405 U. S. 150 (92 SC 763, 31 LE2d 104) (1972), by (a) failing to disclose that it had entered into an agreement with Bails in exchange for her testimony or, at a minimum, had held out a hope of benefit and (b) eliciting testimony from Bails that she was not offered a deal and was there because she needed to tell the truth. For the reasons set forth below, these claims are without merit.

(a) "The State has a duty, under [*Brady*, supra and *Giglio*, supra] to disclose favorable evidence to the defendant in a criminal matter[, and] this includes disclosure of impeachment evidence which could be used to show bias or interest on the part of a key State witness." (Punctuation and footnotes omitted.) *Tate v. State*, 278 Ga. App. 324, 326 (2) (628 SE2d 730) (2006). Accordingly, the State is required to disclose deals with witnesses relating to the disposition of criminal charges against them. See *Ragland v. State*,

238 Ga. App. 664, 665 (519 SE2d 757) (1999).

> In order to show that the State violated *Brady* by failing to reveal a deal with one of its witnesses, a defendant must show that the State possessed evidence of the deal; that the defendant did not possess the evidence nor could he obtain it himself with any reasonable diligence; that the State suppressed evidence of the deal; and that, had the evidence of the deal been disclosed to the defendant, there existed a reasonable probability that the result at trial would have been different.

(Citations and punctuation omitted.) Id. The burden is on the defendant to prove each of these elements. Id. Here, Varner failed to sustain his burden of proving that the State had agreed to any sort of "deal" with Bails in exchange for her testimony.

At the motion for new trial hearing, Bails' counsel explained that he had tried to get Bails' charges reduced prior to her guilty plea but was unable to do so. He subsequently filed a motion to modify her sentence to keep alive the possibility that if Varner, who was a fugitive at the time, were apprehended, Bails' sentence might be reduced if she testified against him. Once Varner was in custody, Bails' counsel approached the prosecutor and offered her testimony to assist the State and for the possibility of getting her sentence reduced. He was never able to reach an agreement with the State, however.

At the motion for new trial hearing, the prosecutor in Varner's case confirmed that although Bails' counsel approached him a number of times and wanted him to allow Bails to plead to a reduced charge in exchange for her testimony, he told Bails' counsel repeatedly that he was not going make any offer in exchange for Bails' testimony. The prosecutor told Bails' counsel that he wanted Bails to testify and tell the truth, but he did not want to compromise her testimony by offering a deal. While he conceded that he intended to cooperate in reducing Bails' sentence if she testified truthfully, he never communicated his intent to Bails' counsel.

Varner argues that the foregoing testimony, coupled with the fact that Bails' sentence was ultimately reduced, shows that the State failed to disclose that it had an agreement with Bails, or, at a minimum, had held out hope to Bails that her sentence would be reduced. We disagree. To the extent Bails or her counsel hoped that Bails' testimony would later benefit her, their subjective hopes are not evidence that a deal existed. *Klinect v. State*, 269 Ga. 570, 572 (2) (501 SE2d 810) (1998) ("That Simpson or his counsel held a hope that testifying at Klinect's trial would benefit him later does not

YALE LAW LIBRARY

show an agreement. [Cit.]"). In addition, there is no evidence that the prosecutor encouraged Bails or her counsel to believe that Bails would, in fact, benefit from testifying against Varner. Nor does the fact that the State ultimately cooperated with Bails' counsel's efforts to reduce Bails' sentence prove that the State and Bails had a deal prior to Varner's trial. *McLemore v. State*, 255 Ga. 107, 108 (2) (335 SE2d 558) (1985) ("A subsequent disposition of a witness' case does not alone prove the existence of a deal.") (citation and punctuation omitted). Under all the circumstances, the trial court's finding that there was no deal between Bails and the State was authorized, and accordingly, Varner suffered no violation of his constitutional rights. See *Klinect*, supra, 269 Ga. at 572 (2).

(b) The following colloquy occurred at trial between Bails and the prosecutor:

Q. What did you do with your case?

A. I ended up taking a ten-year plea bargain. Ten for armed robbery, ten for kidnapping, time run concurrent.

Q. Why are you here today?

A. I feel like I need to tell the truth.

Q. Have you been offered any type of deal in exchange for your testimony?

A. No.

Varner claims that the State violated his rights to due process and a fair trial by eliciting this testimony, when, in fact, there was an alleged agreement between the State and Bails, albeit one that was "unspoken." See *Napue*, supra, 360 U. S. at 269 ("[I]t is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment. The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.") (citations omitted). For the reasons set forth above in Division 1 (a), we disagree. Given that the evidence refutes Varner's claim that there was any deal between Bails and the State, we have no basis for concluding that Bails' testimony that she was not offered a deal was false.

To the extent Varner is arguing that the State engaged in misconduct by eliciting Bails' testimony that she was there to testify because she needed to tell the truth, we disagree. We have no reason to conclude that Bails' characterization of her subjective motivation was false or that the prosecutor knew it to be untrue. Bails' counsel testified at the motion for new trial hearing that his client was hoping for a sentence reduction, but Bails did not testify at the

hearing and explain her reasons for testifying against Varner. In addition, Varner's trial counsel admitted that she was aware of the pending motion to modify Bails' sentence and could have cross-examined Bails about it. "Under these circumstances, we find no merit in [Varner's] due process claim. [Cits.]" *Jones v. State*, 285 Ga. App. 352, 353 (1) (646 SE2d 323) (2007); see also *Peake v. State*, 247 Ga. App. 374, 376 (2) (545 SE2d 309) (2000) ("[T]his is not a situation wherein the State allowed a witness to give false testimony which defense counsel had no means of correcting.") (punctuation and footnote omitted).

2. Varner claims that his trial counsel was ineffective in failing to cross-examine Bails about whether she had a deal with the State or hoped to benefit by testifying against Varner. We disagree.

> To prevail on a claim of ineffective assistance of trial counsel, [a criminal defendant] must show counsel's performance was deficient and that the deficient performance prejudiced him to the point that a reasonable probability exists that, but for counsel's errors, the outcome of the trial would have been different. A strong presumption exists that counsel's conduct falls within the broad range of professional conduct.

(Citation and punctuation omitted.) *Matthews v. State*, 284 Ga. 819, 821-822 (4) (672 SE2d 633) (2009). Given the lack of evidence of a deal between Bails and the State, Varner's trial counsel was not deficient in failing to cross-examine Bails about whether a deal existed. Nor did trial counsel's representation fall outside of the broad range of reasonable professional conduct because she did not ask Bails whether she had a hope of benefitting from her testimony against Varner. While Varner's trial counsel did not cross-examine Bails about the pending motion to reduce her sentence, she challenged Bails' statement that she "need[ed] to tell the truth" by questioning Bails about her failure to correctly identify herself to police. Bails admitted that her true identity was revealed only after her family hired a lawyer who proved that she was not Shannon Driscoll.

Even assuming arguendo that Varner's trial counsel was deficient in failing to cross-examine Bails about whether she held any hope of benefit, Varner has not shown prejudice. Given that the statement Bails initially gave to the police is consistent in material respects with her trial testimony and that both statements are also corroborative of Bentley's trial testimony, we cannot conclude that a reasonable probability exists that the outcome of the trial would have been different if Varner's trial counsel had cross-examined

Bails about a hope of benefit. Under all of the circumstances, we find no clear error in the trial court's determination that Varner received effective assistance of counsel. *Freeman v. State*, 278 Ga. 349, 350 (2) (603 SE2d 214) (2004).

3. Varner claims that the trial court erred in admitting into evidence a letter Bails received in jail without proper authentication that he was the author. We disagree.

Bails testified that she had received the letter several months prior to trial and that it appeared to be from "Vic," although she was not familiar with Varner's handwriting. Included with the letter was a picture of Varner and two other males. The letter mentioned several people she and Varner both knew. The return address on the envelope was not Varner's, but the last page of the letter stated: "I put another . . . name on the front of the envelope so I wouldn't have any problems getting this letter to you, but when you write me back use my name & address." The letter was signed by "Slick Vic," and a mailing address for Victor Varner appeared just above the signature. In the letter, Varner apparently urged Bails to "tell your lawyer that you ain't talking" and stated, among other things that "[i]t wouldn't make [sense] for you to do that [testify against me], because you are already half way into doing your time. . . ." He told her that if he got out of his predicament, he would take care of her or "hold [her] down" during the remainder of her sentence.

"A writing, alleged to be in the handwriting of a party, is inadmissible unless the writing is proved or acknowledged to be genuine. The genuineness of the writing, however, may be proved by circumstantial evidence." (Citations omitted.) *Gunter v. State*, 243 Ga. 651, 657 (4) (256 SE2d 341) (1979). The circumstances described above "were sufficient to make a prima facie showing of authenticity." (Citations and punctuation omitted.) *Arevalo v. State*, 275 Ga. 392, 396 (5) (567 SE2d 303) (2002). Accordingly, the trial court did not err in admitting the letter.

4. Varner argues that the trial court violated the continuing witness rule when, after the jury had begun deliberations, it allowed the jury to come back into the courtroom to review the letter Varner wrote to Bails, discussed above, and another letter Bails wrote while in jail to her boyfriend, who was also Varner's cousin. In her letter, Bails urged her boyfriend to "[t]ell Vic to leave Atlanta or something because they are really looking for him." This claim of error is waived because Varner's trial counsel never objected that allowing the jurors to review the letters in the courtroom would violate the continuing witness rule. See *Evans v. State*, 253 Ga. App. 71, 75 (558 SE2d 51) (2001).

Even if the claim of error were properly before us, it would fail.

> In Georgia, the continuing witness objection is based on the notion that written testimony is heard by a jury when read from the witness stand just as oral testimony is heard when given from the witness stand. But, it is unfair and places undue emphasis on written testimony for the writing to go out with the jury to be read again during deliberations, while oral testimony is received but once.

(Punctuation and footnote omitted.) *Bollinger v. State*, 272 Ga. App. 688, 692 (2) (613 SE2d 209) (2005). Varner has not cited any authority for the proposition that the continuing witness rule not only prevents written testimony from going with the jury but also prevents the jury from reviewing such a writing for a limited period of time back in the courtroom. Even assuming the rule applies in this situation, the letters here were not written testimony, but instead constituted original documentary evidence, circumstantial in nature, of Varner's involvement in the crime at issue. As such, they were not subject to a continuing witness objection. Id.; see also *Porter v. State*, 270 Ga. App. 860, 861-862 (2) (608 SE2d 315) (2004) ("Georgia law permits letters admitted into evidence to go out with the jury.") (citation and punctuation omitted).

5. Varner claims that the trial court erred in admitting Bentley's out-of-court and in-court identifications of him as the perpetrator because the identifications resulted from an impermissibly suggestive lineup procedure. We disagree.

"An identification procedure is impermissibly suggestive when it leads the witness to an all but inevitable identification of the defendant as the perpetrator or . . . is the equivalent of the authorities telling the witness, 'This is our suspect.' " (Citation and punctuation omitted.) *Williams v. State*, 275 Ga. 622, 623 (2) (571 SE2d 385) (2002). Varner moved to suppress Bentley's out-of-court identification, citing several reasons the photographic lineup of six males Bentley viewed was allegedly suggestive, but on appeal, Varner's sole contention is that the lineup was impermissibly suggestive because he was the only one pictured with an open mouth, revealing gold teeth. Bentley had previously told police that the perpetrator had gold teeth on the bottom.

In denying the motion to suppress, the trial court correctly observed that Varner's bottom teeth were not visible in the photograph that appeared in the lineup. In addition, we note that the lineup, which is included in the record on appeal, included black and white pictures, and although Varner's top teeth are visible, it is not readily apparent whether those teeth are gold. Apart from Varner's

mouth being open slightly, the lineup depicts men with similar skin color, hair, and overall appearance. "Since [Varner] did not make a sufficient showing as to how the difference[ ] in his photo[ ] would have rendered the lineup[ ] or procedure[ ] suggestive, we find no abuse of the trial court's discretion in denying the motion to suppress." *Waters v. State*, 281 Ga. 119, 120 (2) (636 SE2d 538) (2006). In addition, Varner did not object to Bentley's in-court identification and has therefore waived that objection on appeal. *Williams*, 275 Ga. at 624 (2).

6. In his final enumeration of error, Varner "avers for record purposes that there was insufficient evidence to support the verdict." Having reviewed the evidence of record, including the testimony of Bentley and Bails, we conclude that the evidence was sufficient for the jury to find Varner guilty of armed robbery beyond a reasonable doubt under the standard of *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

For the reasons set forth above, we affirm the trial court's order denying Varner's motion for a new trial.

*Judgment affirmed. Andrews, P. J., and Barnes, J., concur.*

DECIDED MAY 13, 2009 —

*Robert H. Citronberg*, for appellant.
*Gwendolyn Keyes Fleming, District Attorney, Leonora Grant, Assistant District Attorney*, for appellee.