**FIFTH DIVISION**
**REESE, P. J.,**
**MARKLE and COLVIN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**September 11, 2020**

# In the Court of Appeals of Georgia

A20A1083. WOODRUFF v. THE STATE.

REESE, Presiding Judge.

A jury found Donovan Woodruff guilty of family violence aggravated assault.[1] On appeal from the denial of his motion for new trial, Woodruff argues that the prosecutor made inappropriate comments during closing argument, that the trial court erred in allowing e-mails to go out with the jury during deliberations, and that his trial counsel provided ineffective assistance. For the reasons set forth infra, we affirm.

Viewed in the light most favorable to the jury's verdict,[2] the evidence shows the following. On June 16, 2015, Woodruff and the victim, T. G., had been dating for approximately two years. T. G. was 15 weeks pregnant. That evening, T. G.'s

---

[1] See OCGA § 16-5-21 (i).

[2] See *Martin v. State*, 349 Ga. App. 656, 656-657 (1) (825 SE2d 227) (2019).

neighbor heard a woman screaming, "[g]et off of me." The neighbor called the police and went outside to talk to T. G. The neighbor saw T. G. run out of the apartment "like she was running for her life."

Police officers arrived at the apartment. While talking with Woodruff, an officer located T. G. walking down the street. The officers observed that T. G. had red marks and imprints around her neck that were consistent with choking. Pictures of these injuries were published to the jury. An officer described T. G. as "very, very distraught" with "recent tear marks running down her face."

T. G. told the police that Woodruff had been drinking earlier in the evening. Woodruff fell asleep, and T. G. hid his car keys so that he would not be able to get more alcohol or drive while intoxicated. When Woodruff woke up, he was very irate and demanded the car keys. During the argument, Woodruff pressed his arm against T. G.'s throat while she was on the ground. T. G. was still able to breathe and described this to the officers as "play-fighting[.]" But then Woodruff grabbed her neck with both hands and pressed into her esophagus, preventing her from breathing. T. G. panicked and grabbed a nearby knife in an attempt to get away from Woodruff. T. G. did not cut or stab Woodruff with the knife, and the officers did not observe any injuries on Woodruff. Woodruff took the knife from T. G., and she asked him to let

2

her leave the apartment. Woodruff refused, but T. G. was able to get around Woodruff and flee out the door toward Woodruff's grandmother's house.

At trial, T. G. recounted a different series of events and did not remember the account she had given to the officers the day of the incident. T. G. testified that, while Woodruff was sleeping, she went through his phone and saw a few numbers she did not recognize. She then went over to Woodruff and punched him in the face. T. G. started attacking him, and a knife fell out of his pocket. T. G. testified that she picked up the knife and cut Woodruff on the arm, causing him to bleed.

The State also introduced evidence of an incident that occurred almost two years later in Fife, Washington. Fife city police officers testified that they responded to a 911 call placed by T. G. from a motel. T. G. was in the motel office with her 16-month old son. T. G.'s first words to the officers were "[h]e choked me." T. G. told the officers that she and Woodruff had been arguing. During the argument, T. G. told Woodruff that her child was not his. Woodruff then rolled on top of her on the bed and began choking her with both hands. The officers observed abrasions and nail marks on T. G.'s neck. Pictures of these injuries were published to the jury.

T. G. testified that she did not remember calling 911 and that she did not remember what she had told the officers. She testified that she punched and slapped

3

Woodruff in the face and neck, and that Woodruff did not attack her. The day of the incident, Woodruff also told officers that T. G. had struck him. However, the officers did not observe any injuries on Woodruff or on T. G.'s hands.

The jury found Woodruff guilty of family violence aggravated assault. The court sentenced him to twenty years, with the first seven years to be served in confinement. Woodruff filed a motion for new trial, which the trial court denied after a hearing. This appeal followed.

"We review a decision regarding an improper closing argument for abuse of discretion."[3] We also review a trial court's decision to admit evidence for an abuse of discretion.[4] "In reviewing a claim of ineffective assistance, we give deference to the trial court's factual findings and credibility determinations unless clearly erroneous, but we review a trial court's legal conclusions de novo."[5] With these guiding principles in mind, we now turn to Woodruff's specific claims of error.

---

[3] *Robinson v. State*, 353 Ga. App. 420, 423 (2) (838 SE2d 92) (2020) (citation omitted).

[4] See *Simon v. State*, 279 Ga. App. 844, 847 (2) (632 SE2d 723) (2006).

[5] *Ward v. State*, 353 Ga. App. 1, 5 (836 SE2d 148) (2019) (citation and punctuation omitted).

4

1. Woodruff argues that the State violated his due process rights by commenting on the "cycle of violence" during closing argument. Woodruff contends that testimony regarding the cycle of violence and its effect on his child, who had not been born at the time of the charged crime, was not in evidence.

During closing argument, the prosecutor argued:

I am not asking y'all to try and understand the psychological dynamics of this relationship between this Defendant and [T. G.].

I don't expect you to know why she came in here and recanted, why she chooses to go back to him time and time again, why she doesn't leave. But what I'm asking you to do today is accept it, because you may not like [T. G.]. You may not like her, because it's easy to say, you know what, if she doesn't care, why should I? Why should I care?

But you should care because this case, domestic violence, doesn't just affect [T. G.]. It affects . . . their son, who is now two years old, who saw his dad strangle his mom in Washington [approximately two years after the charged offense].

. . .

Domestic violence is a learned behavior, essentially telling their son . . . "Hey, you can do all sorts of things to your girlfriend and your wife. You can do it over and over again and she'll forgive you."

And this domestic violence cycle, this domestic violence mentality is going to get passed down for [their son] and the cycle will continue.

So you may not like [T. G.], but you have to look at this big picture of domestic violence, because although it happens within the confines of the home or a hotel room, the effects of domestic violence are felt throughout this community.

"As a general rule, prosecutors are granted wide latitude in conducting closing argument. This wide latitude encompasses the prosecutor's ability to argue reasonable inferences raised by the evidence."[6] We have held that similar statements by prosecutors were reasonable extrapolations of the evidence presented at trial.[7]

Given the testimony and evidence presented a trial, which included an e-mail from T. G. to Woodruff detailing the effect of violence on their child, the prosecutor's statements here were a reasonable extrapolation of the evidence.[8]

---

[6] *Gawlak v. State*, 310 Ga. App. 757, 760 (2) (c) (714 SE2d 354) (2011) (citation and punctuation omitted).

[7] See *Pettis v. State*, 350 Ga. App. 421, 424 (2) (a) (829 SE2d 613) (2019) (prosecutor's comments on the cycle of violence and characterization of the victims' refusal to stand by their statements at the scene was a reasonable extrapolation of the evidence); see also *Hendrix v. State*, 298 Ga. 60, 66 (2) (d) (779 SE2d 322) (2015) (prosecutor's comments on witness intimidation after witnesses' reluctance to testify "drew on reasonable inferences from admissible evidence" and "was within the wide realm of acceptable closing argument") (citation omitted).

[8] See *Pettis*, 350 Ga. App. at 424 (2) (a).

2. Woodruff argues that the trial court erred in allowing e-mails sent by Woodruff to T. G. while he was in jail to go out with the jury during deliberations. He contends that the e-mails were not authenticated and that the e-mails violated the continuing witness rule.

At trial, the State had T. G. read letters and e-mails sent between T. G. and Woodruff while Woodruff was incarcerated. Although T. G. denied sending or receiving the e-mails, she testified that she had been communicating with Woodruff while he was incarcerated. The State submitted a certificate of authenticity from the jail regarding the e-mails, and the trial court admitted the e-mails as evidence.

> Under OCGA § 24-9-901 (a), authentication of evidence may be achieved through any of a variety of means affording evidence sufficient to support a finding that the matter in question is what its proponent claims. Documents from electronic sources are subject to the same rules of authentication as other more traditional documentary evidence and may be authenticated through circumstantial evidence, which may include the appearance, contents, substance, internal patterns, or other distinctive characteristics of the documents, taken in conjunction with circumstances. Once the party seeking to authenticate evidence presents a prima facie case that the evidence is what it purports to be, the

evidence is properly admitted, leaving the ultimate question of authenticity to be decided by the jury.[9]

With respect to the continuing witness rule:

In Georgia, the continuing witness objection is based on the notion that written testimony is heard by the jury when read from the witness stand just as oral testimony is heard when given from the witness stand. But, it is unfair and places undue emphasis on written testimony for the writing to go out with the jury to be read again during deliberations, while oral testimony is received but once. The types of documents that have been held subject to the rule include affidavits, depositions, written confessions, statements, and dying declarations.[10]

In this case, the State authenticated the e-mails such that there was sufficient evidence to allow a reasonable jury to find that T. G. had sent and received the e-mails in question. The State provided a certificate of authenticity from the jail, T. G. acknowledged that she had been communicating with Woodruff, and the e-mails

---

[9] *Nicholson v. State*, 307 Ga. 466, 475 (5) (837 SE2d 362) (2019) (citations and punctuation omitted).

[10] *Davis v. State*, 285 Ga. 343, 348 (8) (676 SE2d 215) (2009) (citations and punctuation omitted).

contained information related to the details of the case.[11] "Under all of these circumstances, it is very unlikely that anyone other than [Woodruff and T. G.] had written the [e-mails]."[12] Accordingly, the trial court did not abuse its discretion in admitting the e-mail records.

Nor did the trial court violate the continuing witness rule by allowing the e-mails to go out with the jury. The e-mails did not constitute "statement[s] in lieu of testimony," which include affidavits, depositions, or answers to interrogatories.[13] "Instead, [the e-mails] were original documentary evidence, and were properly allowed to go out with the jury."[14]

---

[11] See OCGA § 24-9-901 (evidence may be authenticated by "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances[ ]"); *Nicholson*, 307 Ga. at 475 (5) (text messages were authenticated with a certificate of authenticity from AT&T and by the contents and recipients of the messages); *Foster v. State*, 294 Ga. 383, 384-385 (3) (754 SE2d 33) (2014) (letter authenticated by references to the defendant's family and friends, details of the case, and the defendant's assigned jail cell number).

[12] *Foster*, 294 Ga. at 385 (3) (citation omitted).

[13] See *Vinyard v. State*, 177 Ga. App. 188, 190 (1) (338 SE2d 766) (1985); see also *Davis*, 285 Ga. at 348 (8).

[14] *Davis*, 285 Ga. at 348 (8); see *Foster*, 294 Ga. at 385 (5) (letter written by defendant was original documentary evidence); *Varner v. State*, 297 Ga. App. 799, 805 (4) (678 SE2d 515) (2009) (same); *Vinyard*, 177 Ga. App. at 191 (letter written by defendant's brother to defendant was original documentary evidence).

3. Woodruff argues that his counsel provided ineffective assistance. In order to evaluate Woodruff's claims of ineffective assistance of counsel, we apply the two-pronged test established in *Strickland v. Washington*,[15] which requires Woodruff to show that his trial counsel's performance was deficient and that prejudice resulted.[16]

> To show that the performance of his lawyer was deficient, the defendant must prove that his lawyer performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in the light of prevailing professional norms. As for prejudice, the proper standard requires the defendant to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. If the defendant fails to satisfy either prong of the *Strickland* test, this Court is not required to examine the other.[17]

We will address each of his claims of ineffective assistance in turn.

---

[15] 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984).

[16] See *Wilkerson v. State*, 345 Ga. App. 652, 655-656 (4) (813 SE2d 180) (2018).

[17] *Wilkerson*, 345 Ga. App. at 656 (4) (citation and punctuation omitted).

10

(a) Woodruff argues that counsel provided ineffective assistance by failing to object to the prosecutor's statements that Woodruff had requested a lesser-included charge of simple battery.

During closing argument, the prosecutor stated:

> Now, you are also going to hear, and you're going to hear the charge, the Judge will charge you on a lesser included charge of simple battery, okay. The Defense has asked for it and they are entitled to that.
> But essentially, this is not a simple battery case, okay. So what is simple battery? Simple battery is a push or a shove, okay. That's simple battery.
> What we have here is aggravated assault, strangulation. Simple battery is not taking both hands, grabbing the victim's neck, and applying so much pressure that you have left thumbprints at the base of the esophagus. That's not a push or a shove. That's an aggravated assault, strangulation.

Generally, a prosecutor should refrain from mentioning that the defendant requested the lesser-included charge.[18] At the motion for new trial hearing, defense counsel testified that, at the time of trial, he was unaware that the prosecutor's statements were objectionable. However, defense counsel also testified that it was beneficial to Woodruff for the jury to keep hearing the term simple battery. During

---

[18] See *Newman v. State*, 334 Ga. App. 439, 441 (1) (779 SE2d 678) (2015).

11

closing argument at trial, defense counsel mentioned that there would be a lesser-included charge of simple battery, but argued that the evidence did not support that charge either.

"The decision of whether to interpose certain objections is a matter of trial strategy and tactics. Trial tactics and strategy, no matter how mistaken in hindsight, are almost never adequate grounds for finding trial counsel ineffective unless they are so patently unreasonable that no competent attorney would have chosen them."[19] Here, defense counsel testified that it was beneficial to Woodruff for the jury to keep hearing the term simple battery.[20] Moreover, an objection by defense counsel may have highlighted the objectionable statement.[21] Accordingly, Woodruff has failed to demonstrate deficient performance.

---

[19] *Gray v. State*, 291 Ga. App. 573, 579 (2) (662 SE2d 339) (2008) (citations and punctuation omitted).

[20] See *Johnson v. State*, 290 Ga. App. 255, 259 (1) (d) (659 SE2d 638) (2008) (declining to object can be considered reasonable trial strategy).

[21] See *Newman*, 334 Ga. App. at 442-443 (1) (affirming trial court's decision not to give a curative instruction after the State mentioned that the defendant had requested the lesser-included charge because the court believed the curative instruction would have emphasized the objectionable statement).

Even if defense counsel was deficient for failing to object, Woodruff has not shown prejudice. "[T]he statement at issue was a passing reference only and . . . unlikely to have caused a different result in the verdict."[22] The trial court instructed the jury regarding the State's burden of proof on each element of the crime, and advised the jury that statements made by the attorneys were not evidence.[23] Thus, Woodruff has failed to show ineffective assistance of counsel based on counsel's failure to object to the prosecutor's statement during closing argument.

(b) Woodruff argues that counsel provided ineffective assistance by failing to object to the prosecutor's statements regarding the State's decision to prosecute the case. During closing argument, the prosecutor stated: "The State of Georgia took that decision, whether or not to prosecute a case, out of the victim's hands, right? They passed a law and now it's up to the State of Georgia to move forward."

Under OCGA § 17-4-20.1 (a), "[w]henever a law enforcement officer responds to an incident in which an act of family violence . . . has been committed, the officer shall not base the decision of whether to arrest and charge a person on the specific

---

[22] *Newman*, 334 Ga. App. at 442 (1).

[23] See id. at 442-443 (1).

13

consent of the victim or on a request by the victim solely or on consideration of the relationship of the parties."

The prosecutor's statements during closing argument were a response to T. G.'s testimony at trial.[24] The statements fell within the "wide latitude" afforded to prosecutors during closing argument.[25] And the prosecutor's argument was not a misstatement of law.[26] "Because the prosecutor's argument was permissible, trial counsel's failure to object to it cannot serve as the basis for an ineffective assistance claim in this instance."[27]

(c) Woodruff argues that counsel provided ineffective assistance by failing to object to e-mails being read to the jury by T. G. after T. G. denied knowledge of those e-mails. He contends that T. G. did not authenticate the e-mails.

As explained in Division 2 above, the State authenticated the e-mails such that there was sufficient evidence to allow a reasonable jury to find that T. G. sent and

---

[24] See *Allen v. State*, 277 Ga. 502, 504 (3) (d) (591 SE2d 784) (2004) ("Counsel may address during closing argument the possible motives for a witness's testimony.") (citation omitted).

[25] *Gawlak*, 310 Ga. App. at 760 (2) (c).

[26] See OCGA § 17-4-20.1 (a).

[27] *Gawlak*, 310 Ga. App. at 760 (2) (c) (citation and punctuation omitted).

14

received the e-mails in question. "Thus, trial counsel did not perform deficiently by failing to make a meritless objection to the admission of this evidence."[28]

(d) Finally, Woodruff asks us to consider the cumulative effect of counsel's errors. However, as Woodruff has failed to show any deficiencies in counsel's conduct, "[he] has likewise failed to show cumulative error."[29]

*Judgment affirmed. Markle and Colvin, JJ., concur.*

---

[28] *Wesley v. State*, 286 Ga. 355, 356 (3) (a) (689 SE2d 280) (2010) (citation omitted).

[29] *Crider v. State*, __ Ga. App. __, __ (4) (846 SE2d 205) (2020) (citation omitted).