296 Ga. 493
FINAL COPY

S14A1442. NWAKANMA v. THE STATE.
S14A1443. FRANCIS v. THE STATE.

BLACKWELL, Justice.

Miracle Nwakanma and Louis Francis were tried together by a Cobb County jury and convicted of the murder of Justin Brown, among other crimes. Both Nwakanma and Francis appeal. Nwakanma contends only that he was denied due process when the prosecution failed to reveal a deal with a material witness and to correct critical misstatements of fact during that witness's testimony. Francis contends that the trial court erred when it failed to sever his trial from that of his co-defendants, when it limited his questioning of prospective jurors and refused to strike one of them, when it limited the scope of his cross-examination of a witness for the State, and when it admitted certain evidence at trial. Francis also claims that he was denied the effective assistance

of counsel. Upon our review of the record and briefs, we see no error, and we

affirm.[1]

---

[1] The crimes were committed on August 2, 2007. Along with Milton Blackledge, David Hayes, and Muhammed Abdus-Salaam, Nwakanma and Francis were indicted on December 21, 2007, and each was charged with malice murder, three counts of felony murder, one count of conspiracy to commit armed robbery, four counts of aggravated assault, one count of violation of the Georgia Street Gang Terrorism and Prevention Act, and one count of unlawful possession of a firearm during the commission of a crime. In addition, Nwakanma and Hayes were charged with unlawful possession of a firearm by a convicted felon and felony murder predicated on unlawful possession of a firearm by a convicted felon. Francis was also charged with possession of cocaine and possession of less than one ounce of marijuana, but those charges were later put on the dead docket. The prosecution elected not to proceed with the case against Abdus-Salaam until a subsequent date, and the trial of the remaining four co-defendants commenced on May 4, 2009. The trial court directed a verdict of acquittal for each defendant on the charge of aggravated assault upon Charles Reams, and the jury returned its verdict on May 20, 2009, finding each defendant not guilty of malice murder and guilty on all the other remaining counts. Nwakanma and Francis each was sentenced to imprisonment for life for the felony murder of Brown predicated on the aggravated assault upon him, a concurrent term of imprisonment for ten years for conspiracy to commit armed robbery, a consecutive term of imprisonment for twenty years for aggravated assault upon Scott Keller, a consecutive term of imprisonment for ten years for aggravated assault upon Josh Washington, a concurrent term of imprisonment for fifteen years for violation of the Georgia Street Gang Terrorism and Prevention Act, and a consecutive term of imprisonment for five years for unlawful possession of a firearm during the commission of a crime. Nwakanma was sentenced to an additional concurrent term of imprisonment for five years for unlawful possession of a firearm by a convicted felon. The verdict as to the other counts of felony murder was vacated by operation of law, Malcolm v. State, 263 Ga. 369, 371-372 (4) (434 SE2d 479) (1993), and the remaining aggravated assault (upon Brown) merged with the felony murder (of Brown). It appears from the record that Blackledge and Hayes were sentenced in the same way as Nwakanma and Francis, and Abdus-Salaam later pled guilty to reduced charges and was sentenced to a total of thirty years, with fifteen to be served in custody. Nwakanma timely filed a motion for new trial on June 9, 2009. On September 2, 2009, Francis requested leave to file an out-of-time motion for new trial, that request was granted by consent order on September 4, 2009, and Francis filed a motion for new trial on October 5, 2009. Nwakanma amended his motion for new trial on January 20, 2012 and again on March 6, 2012. Francis amended his motion for new trial on April 25, 2012. The trial court denied Francis's motion on May 8, 2013, and he timely

1. Viewed in the light most favorable to the verdict, the evidence shows that on the evening of August 1, 2007, Nwakanma, Francis, Muhammed Abdus-Salaam, Milton Blackledge, and David Hayes — all members of a criminal street gang known as "MPRC 300" — made plans to rob Dylan Wattecamps, who recently had been involved in a dispute with Abdus-Salaam over a sale of marijuana. Early on the morning of August 2, Hayes gave Nwakanma a .380 caliber pistol, and Blackledge drove Nwakanma, Francis, and Abdus-Salaam to the gated apartment complex in which Wattecamps lived. Hayes drove there separately in his pickup truck, arranged entry for the other four men through a resident he knew, parked his truck across the street from the entry gate, and waited there while the others entered the apartment complex. After parking near Wattecamps's apartment, Blackledge and his passengers began to survey the area on foot. Blackledge and Nwakanma were armed with silver handguns. Wattecamps was having a party in his third-floor apartment, and when one of his guests left, she saw the men standing around and recognized Nwakanma.

filed a notice of appeal on May 17, 2013. The trial court denied Nwakanma's motion on July 17, 2013, and he timely filed a notice of appeal on July 24, 2013. The cases were docketed in this Court for the September 2014 term. Nwakanma's case was argued on September 22, 2014, and Francis's case was submitted for decision on the briefs.

3

The four men decided to go forward with their plan, and Nwakanma gave Hayes's gun to Francis.

As the four men were preparing to enter the apartment, another guest came out, and Blackledge hit him in the face. The four men then ran down the stairs and through the parking lot, pursued by Wattecamps and several of his guests. Brown, Scott Keller, and Josh Washington, who had just parked and were walking to the party, heard Wattecamps yell "get them," and began to chase the four men. Blackledge and Francis then fired several shots, one of which fatally wounded Brown in the chest. Nwakanma, Francis, Blackledge, and Abdus-Salaam climbed over the apartment complex fence and hurried into Hayes's truck. Both Francis and Blackledge claimed to have shot Brown, and Hayes drove everyone to Abdus-Salaam's apartment. Six matching .380 caliber shell casings and three .380 caliber projectiles, including the one that entered Brown's chest, were recovered. All of the shell casings came from the same gun, and two of the projectiles, including the one that killed Brown, were fired from the same pistol. Francis and Blackledge admitted to being present at the apartment complex during the shooting, and while in jail, Francis confessed his

involvement to another inmate. Abdus-Salaam confessed his role in the crimes to police and testified at trial.

Neither Nwakanma nor Francis disputes the legal sufficiency of the evidence. We nevertheless have independently reviewed the evidence to assess whether it is sufficient to sustain their convictions. Upon that review, we conclude that the evidence adduced at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Nwakanma and Francis were guilty of the crimes of which they were convicted. Jackson v. Virginia, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2. We now consider Nwakanma's contention that the prosecution failed to reveal a deal between the State and Abdus-Salaam and failed to correct critical misstatements of fact about the existence of a deal during Abdus-Salaam's testimony. It is settled that the State has "a duty to reveal any agreement, even an informal one, with a witness concerning criminal charges pending against that witness, and a failure to disclose such an agreement constitutes a violation of the due process requirements of Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963)." Wimes v. State, 293 Ga. 361, 362 (2) (744 SE2d 787) (2013). See also Giglio v. United States, 405 U. S. 150,

5

154-155 (92 SCt 763, 31 LE2d 104) (1972). In addition, the State may not knowingly use a witness's false testimony that he received no promise of consideration in exchange for his testimony, and the prosecutor's failure to correct such testimony that he knows to be false denies the defendant his right to due process of law. Napue v. Illinois, 360 U. S. 264, 269-270 (79 SCt 1173, 3 LE2d 1217) (1959); Smith v. Zant, 250 Ga. 645, 651 (3) (301 SE2d 32) (1983).

At a pretrial hearing in this case, both the prosecutor and Abdus-Salaam confirmed that Abdus-Salaam had no plea agreement or deal with the State but that he nevertheless would waive his Fifth Amendment rights and testify against his co-defendants. At trial, Abdus-Salaam testified that there was no plea bargain or deal for his testimony, that he did not understand any future deal to depend on how he testified, that he did not expect to gain any benefit or leniency from his testimony, and that he decided to testify to clear his conscience when his co-defendants would not admit what they had done. In an effort to show that Abdus-Salaam did have a deal when he testified, Nwakanma points to the prosecutor's testimony at the hearing on the motion for new trial that the lawyer for Abdus-Salaam continually asked for reduced charges and a lesser sentence

6

in exchange for his testimony and that the prosecutor said he would keep an open mind toward future discussions. But this testimony did not suggest the existence of even an informal agreement. See Klinect v. State, 269 Ga. 570, 572 (2) (501 SE2d 810) (1998). And the prosecutor indicated that there was no specific agreement to discuss a possible plea after completion of the co-defendants' trial. See id. "[N]ot everything said to a witness or to his lawyer must be disclosed. . . . Some promises, agreements, or understandings do not need to be disclosed, because they are too ambiguous, or too loose or are of too marginal a benefit to the witness to count." Tarver v. Hopper, 169 F3d 710, 717 (C) (11th Cir. 1999).

Abdus-Salaam's lawyer testified that the only plea offer he had received — for a sentence of 25 years — had been rejected before the co-defendants' trial, that there was no deal, that there were no specific conversations with the prosecution about how the resolution of Abdus-Salaam's case would be addressed further after his testimony, and that the lawyer had given Abdus-Salaam the admittedly risky advice to testify "blindly," simply hoping for a better offer after the co-defendants' trial. Abdus-Salaam's testimony on motion for new trial generally was consistent with that of his lawyer. That Abdus-

7

Salaam "or his counsel held a hope that testifying in [the co-defendants'] trial would benefit him later does not show an agreement." Klinect, 269 Ga. at 572 (2) (citation omitted). See also Tarver, 169 F3d at 717 (C) ("The simple belief by a defense attorney that his client may be in a better position to negotiate a reduced penalty should he testify against a codefendant is not an agreement within the purview of Giglio." (Citation omitted.)); Hudson v. State, 277 Ga. 581, 586 (5) (591 SE2d 807) (2004) ("That [the witness] may have expected help for his cooperation does not establish that a deal or agreement was made between him and the State." (Citation omitted.)). And "there is no evidence that the prosecutor encouraged [Abdus-Salaam] or [his] counsel to believe that [he] would, in fact, benefit from testifying against [Nwakanma]." Varner v. State, 297 Ga. App. 799, 802 (1) (a) (678 SE2d 515) (2009). The fact that after the co-defendants' trial Abdus-Salaam entered a plea agreement does not itself establish the existence of a deal. See Wimes, 293 Ga. at 363 (2).

Citing the testimony of the prosecutor (as corroborated by Abdus-Salaam's lawyer) that no deal or offer was extended to Abdus-Salaam in exchange for his testimony, the trial court found that Nwakanma had "failed to show evidence of any deal." This finding was not clearly erroneous, but rather

8

"was authorized, and there was no due process violation." Klinect, 269 Ga. at 572 (2) (citation omitted). See also Wimes, 293 Ga. at 363 (2); Peralta v. State, 276 Ga. 218, 219 (2) (576 SE2d 853) (2003) ("The trial court's findings of fact on motion for new trial are upheld unless clearly erroneous." (Citations omitted.)). Because the evidence refutes Nwakanma's claim that there was a deal between Abdus-Salaam and the State, there is likewise no factual basis for Nwakanma's claim that Abdus-Salaam's testimony about his motivation for testifying was false. See Varner, 297 Ga. App. at 802 (1) (b). To the extent that Nwakanma is arguing that the State engaged in misconduct by eliciting that testimony and making arguments about it to the jury, there is "no reason to conclude that [Abdus-Salaam's] characterization of [his] subjective motivation was false or that the prosecutor knew it to be untrue." Id. Indeed, the prosecutor testified that, "[i]f you're asking what [Abdus-Salaam] was thinking, I don't know that I could answer that question. But all I can tell you is . . . [w]e told him there was no plea offer and that it was important for him to tell the truth." In addition, all of the co-defendants extensively cross-examined Abdus-Salaam about his motivations. Under these circumstances, there was no due process violation. See Varner, 297 Ga. App. at 803 (1) (b).

9

3. We turn next to Francis's contention that the trial court erred when it denied his pretrial motion to sever his trial from that of his co-defendants. When several defendants are indicted together for a capital crime, but the State does not seek the death penalty, whether the defendants are to be tried together or separately is a matter committed to the sound discretion of the trial court. OCGA § 17-8-4 (a). "In ruling on a severance motion, the court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses." Hicks v. State, 295 Ga. 268, 278 (4) (759 SE2d 509) (2014) (citation omitted). And "the burden is on the defendant requesting the severance to do more than raise the possibility that a separate trial would give him a better chance of acquittal. He must make a clear showing that a joint trial would lead to prejudice and a consequent denial of due process." Thomas v. State, 293 Ga. 829, 830-831 (2) (750 SE2d 297) (2013) (citation and punctuation omitted). In this case, we conclude that Francis has made no "clear showing of prejudice and a consequent denial of due process." Id. (punctuation omitted).

Francis argues that he was prejudiced by a joint trial because of the risk of confusion when jurors have to keep up with evidence against multiple defendants on an eighteen-count indictment. There was little likelihood of actual juror confusion in this case, however, because only four defendants were tried and the law and evidence that applied to each of them were substantially the same. See Hicks, 295 Ga. at 278 (4). They were jointly tried for almost the same offenses, which involved the same witnesses, whose credibility the co-defendants jointly attacked, and the State's evidence indicated that they acted in concert. See Flournoy v. State, 294 Ga. 741, 748 (5) (755 SE2d 777) (2014); Moon v. State, 288 Ga. 508, 510 (2) (705 SE2d 649) (2011). In addition, the trial court properly instructed the jury that it was to independently determine the guilt or innocence of each defendant as to each count, and the court provided separate verdict forms for each defendant in order to avoid the potential for confusion. See Griffin v. State, 292 Ga. 321, 326 (7) (737 SE2d 682) (2013).

Francis also argues that he was prejudiced by the admission of similar transaction evidence against his co-defendants. But such evidence did not directly implicate Francis, and the trial court gave appropriate limiting instructions, indicating that the similar transaction evidence could be considered

11

only as to each co-defendant against whom it was admitted. See Billings v. State, 293 Ga. 99, 105 (6) (745 SE2d 583) (2013); Moon, 288 Ga. at 510 (2).

Finally, Francis asserts, without any explanation, that he and his co-defendants presented antagonistic defenses. Francis and his co-defendants, however, did not present any evidence, and their defenses were, for the most part, consistent, including, for instance, their attacks on the credibility of Abdus-Salaam and other prosecution witnesses. See Thomas, 293 Ga. at 831 (2). Even to the extent that Francis and his co-defendants urged differing defenses, he has completely failed to show any specific prejudice such that the joint trial denied him due process.[2] See id. at 832 (2); Flournoy, 294 Ga. at 748 (5).

4. Francis also claims that the trial court erred when it refused to allow his lawyer to ask prospective jurors the following question: "Given that there are four defendants on trial in this case, do any of you think that you might be unable to consider and apply the evidence separately to each defendant?" About the proper scope of voir dire, we must keep in mind that "the single purpose for

---

[2] Our review of the record has revealed no such harm. We note that none of the co-defendants testified, Blackledge was the only one of them who made a statement, and the trial court excluded any mention of Francis from Blackledge's statement. See Griffin, 292 Ga. at 326 (7); Satterfield v. State, 256 Ga. 593, 596-597 (3) (351 SE2d 625) (1987).

12

voir dire is the ascertainment of the impartiality of jurors, their ability to treat the cause on the merits with objectivity and freedom from bias and prior inclination." Alexander v. State, 294 Ga. 345, 346-347 (2) (751 SE2d 408) (2013) (citation and punctuation omitted). "A trial court is vested with a broad discretion to limit the scope of voir dire with regard to abstract or technical legal matters." Starks v. State, 283 Ga. 164, 167 (5) (656 SE2d 518) (2008) (citation omitted). See also Alexander, 294 Ga. at 347 (2) ("Questions of a technical legal nature and questions that call for prejudgment are improper in a voir dire examination." (Citation omitted.)). Francis's question about considering and applying the evidence separately to each co-defendant was "of a technical legal nature as [it was a] subject[ ] of the instruction by the court at the conclusion of the trial. [See Division 3, supra.]" Wallace v. State, 248 Ga. 255, 259 (2) (282 SE2d 325) (1981) (where the court at a trial on a special plea of insanity sustained objections to questions asking each juror "whether he would follow a charge of the court as to mental competency and whether the juror could set aside any evidence which might be elicited pertaining to guilt or innocence of the actual charges"). Accordingly, we find no abuse of the trial court's broad discretion to limit the scope of voir dire.

13

5. Francis further contends that the trial court erred when it refused to strike a prospective juror who stated that he was afraid that he could not be fair and impartial in a case where there was an allegation of gang activity. By agreement of all parties, the court reporter was not present to take down voir dire. The court reporter did appear from time to time to take down certain portions of the proceeding dealing with challenges to certain jurors, but a full record of the voir dire as to the prospective juror about whom Francis complains does not exist. "If counsel raise issues on appeal relating to voir dire, they also must transcribe the voir dire in order for there to be an appellate review, as an appellant carries the burden of showing error by the record." Bryant v. State, 270 Ga. 266, 272 (4), n. 18 (507 SE2d 451) (1998) (citation omitted).

Because voir dire and jury selection were not transcribed in this case, there is no contemporaneous record as to whether Francis or any of his co-defendants exercised a peremptory strike as to the prospective juror whom Francis challenged. And although this prospective juror did not serve on the jury, we have not located in the record any evidence of how, when, or by whom he was struck from the panel. It is true that defendants are not required to exhaust their peremptory strikes as a condition of establishing harm. See Stolte v. Fagan, 291

14

Ga. 477, 478 (1) (731 SE2d 653) (2012); Harris v. State, 255 Ga. 464, 465 (2) (339 SE2d 712) (1986). But if the prospective juror is removed without any use of peremptory strikes by the defense, as where the State exercises a peremptory strike to remove the juror, any error in the trial court's refusal to strike the juror for cause is harmless because the removal of the juror did not cost the defense any peremptory strike. Pyburn v. State, 175 Ga. App. 158, 159 (3) (332 SE2d 899) (1985). See also Jenkins v. State, 269 Ga. 282, 291 (13) (498 SE2d 502) (1998) (even if voir dire allowed a prospective juror to prejudge the case, the error was "harmless because the State used one of its peremptory challenges to remove this juror"). Because Francis has not shown from the record that the prospective juror whom he challenged was struck from the panel through the exercise of a peremptory strike by the defense rather than the State, Francis has failed to establish any harm from the trial court's refusal to strike that juror for cause.

Moreover, even if the prospective juror at issue was struck by the defense, Francis has not shown that the trial court erred, as our review is limited to the portions of voir dire that were transcribed. See Valdez v. State, 310 Ga. App. 274, 278 (2) (712 SE2d 656) (2011). The relevant portion of voir dire that was

15

transcribed — which indicates that the juror's earlier responses were not transcribed — shows only that the juror was "worried" and "afraid" that he could not be fair and impartial as a result of the allegation of gang activity. Nothing in these transcribed responses compelled a finding that he had formed an opinion of Francis's guilt or innocence that was so fixed and definite that he would be unable to set that opinion aside and to decide the case based on the evidence and the court's instructions. See Corza v. State, 273 Ga. 164, 166-167 (3) (539 SE2d 149) (2000). In the absence of a full transcript setting forth all of the prospective juror's specific voir dire responses, we cannot say that the trial court abused its discretion in refusing to excuse the juror for cause. See id.; Valdez, 310 Ga. App. at 279 (2).

6. Francis also contends that the trial court erred when it forbid cross-examination of Abdus-Salaam about whether the prosecutor had instructed him to "testify against" the co-defendants. "[D]efense counsel is entitled to a reasonable cross-examination on the relevant issue of whether a witness entertained any belief of personal benefit from testifying favorably for the prosecution." Manley v. State, 287 Ga. 338, 340 (2) (698 SE2d 301) (2010) (citation and punctuation omitted). But "the extent of cross-examination with

16

respect to an appropriate subject of inquiry is within the sound discretion of the trial court, so long as the court does not cut off all inquiry on a subject that the defense is entitled to cross-examine on." Brockman v. State, 292 Ga. 707, 725 (11) (739 SE2d 332) (2013) (citation and punctuation omitted). As we have repeatedly explained, trial courts retain wide latitude to impose reasonable limits on cross-examination "based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Manley, 287 Ga. at 340 (2) (citation and punctuation omitted).

In this case, Hayes's lawyer asked Abdus-Salaam: "[I]sn't it true, sir, that your last time in court, the district attorney informed you to testify against these people; correct?" After Abdus-Salaam answered "Yes," Hayes's lawyer asked whether the prosecutor "told you to testify against David Hayes." At that point, the prosecutor objected, the jury was excused, the objection was sustained, and Francis's lawyer joined Hayes's opposition to the State's objection. The cross-examination at issue was referring to a pretrial hearing in which Abdus-Salaam waived his Fifth Amendment rights and was asked by the prosecutor whether he understood that, by such waiver, he "could be called as a witness for the State

17

to testify against these four" co-defendants. So the record shows that the prosecutor neither instructed Abdus-Salaam to testify against the co-defendants nor implied that he should not testify fully and truthfully. And the phrase "testify against" was an appropriate and concise way to refer to the testimony of a witness called by the State. See U. S. Const., Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses *testifying against* him . . . ." (Emphasis supplied.)); Ga. Const. of 1983, Art. I, Sec. I, Par. XIV ("Every person charged with an offense against the laws of this state . . . shall be confronted with the witnesses *testifying against* such person." (Emphasis supplied.)). Accordingly, it appears that the cross-examination of Abdus-Salaam carried with it the potential for confusing or marginally relevant testimony and that the trial court therefore did not abuse its discretion to impose reasonable limits on cross-examination without cutting off all inquiry into the appropriate subject of whether Abdus-Salaam had any belief that he would personally benefit from testifying for the State.

Moreover, any error in limiting the scope of cross-examination was harmless. The original question of whether the prosecutor informed Abdus-Salaam that he should testify against the co-defendants was answered

18

affirmatively, the jury did not hear the trial court sustain the prosecutor's objection, and the court never instructed the jury to disregard Abdus-Salaam's affirmative answer. See Freeman v. State, 230 Ga. 85, 86 (1) (195 SE2d 416) (1973) ("even if the exclusion of the answer of the witness on the objection of the state was error, it was rendered harmless by the subsequent admission of testimony to the substantial effect as that sought to be elicited by the question objected to"); Thomas v. State, 199 Ga. App. 49, 51-52 (8) (404 SE2d 315) (1991) ("no harm in not allowing the witness to answer the question since she testified almost immediately afterwards" in a way that answered the prohibited question). In addition, as we have already noted in Division 2, supra, all four co-defendants were permitted to extensively cross-examine Abdus-Salaam about his truthfulness and his motivation for testifying. See Younger v. State, 288 Ga. 195, 199-200 (3) (702 SE2d 183) (2010); Manley, 287 Ga. at 343 (2).

7. Francis asserts that a notebook admitted into evidence was irrelevant and prejudicial and amounted to inadmissible hearsay. But his "failure to raise an objection at trial on hearsay grounds precludes our consideration of his hearsay objection." Johnson v. State, 294 Ga. 86, 88 (2) (750 SE2d 347) (2013) (citation omitted). See also Edwards v. State, 282 Ga. 259, 260 (4) (646 SE2d

19

663) (2007). The notebook was recovered from a bedroom in Nwakanma's home and contained handwritten and printed material referring to gangs, as well as copies of school records bearing Nwakanma's name. Although the notebook does not specifically mention the gang to which the co-defendants allegedly belonged, a detective testified that such a notebook is known as a "gang bible" or "book of knowledge," that it contains gang symbols, sayings, and signs, that it identifies the gang's enemies, and that there are hybrid gangs in the area with members who bring with them influences from other traditional gangs. Accordingly, the notebook was relevant to the count of the indictment alleging that the defendants were members of a criminal street gang. See Sifuentes v. State, 293 Ga. 441, 445 (3) (746 SE2d 127) (2013). And the trial court did not abuse its discretion when it found that any prejudicial effect of the evidence was outweighed by its probative value. See id.; Wornum v. State, 285 Ga. 168, 169 (2) (674 SE2d 876) (2009). The fact that the notebook does not specifically name the co-defendants' alleged gang goes to its evidentiary weight and does not render it inadmissible. See Sifuentes, 293 Ga. at 445 (3).

8. Last, we turn to Francis's contention that his trial lawyers were ineffective because they failed to object to the prosecutor's disparaging remarks

20

about them during closing argument. Although Francis's amended motion for new trial asserted that the prosecutor in his closing argument improperly denigrated Francis's lawyers, the only ineffectiveness claims raised in the motion were that the lawyers failed to have the entire voir dire recorded and that the closing argument on behalf of Francis impaired his defense. At the hearing on the motion for new trial, one of Francis's lawyers testified but was not questioned about the prosecutor's closing argument, only about closing argument for the defense, and Francis's appellate lawyer presented no argument about the failure to object to the prosecutor's closing argument. In its order denying the motion for new trial, the trial court unsurprisingly said nothing about the ineffectiveness claim now raised on appeal. Because Francis did not raise this claim in his amended motion for new trial or at the hearing and did not obtain a ruling on it by the trial court, he did not preserve the claim for review on appeal. See Jones v. State, 294 Ga. 501, 503 (2) (755 SE2d 131) (2014); Cowart v. State, 294 Ga. 333, 337-338 (3) (751 SE2d 399) (2013).

Judgments affirmed. All the Justices concur.

Decided January 20, 2015 – Reconsideration denied February 16, 2015.

Murder. Cobb Superior Court. Before Judge Ingram.

Brian Steel, for appellant (case no. S14A1442).

Edwin J. Wilson, for appellant (case no. S14A1443).

D. Victor Reynolds, District Attorney, Jesse D. Evans, Benjamin M. First, Amelia G. Pray, Assistant District Attorneys, Samuel S. Olens, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Jason M. Rea, Assistant Attorney General, for appellee.