302 Ga. 685
FINAL COPY

S17A1412. CARTER v. THE STATE.

BLACKWELL, Justice.

James Marlon Carter was tried by a Jeff Davis County jury and convicted of malice murder and other crimes in connection with the shooting death of Chandler Johnson. Carter appeals, contending that the evidence is legally insufficient to sustain his convictions and that the trial court erred when it struck two prospective jurors, when it refused to strike a third juror, when it admitted evidence of his pretrial statements, and when it allowed Johnson's mother to testify about certain text messages, which she said that she had received from Carter. Upon our review of the record and briefs, we see no error, and we affirm.[1]

_____

[1] Johnson was killed on September 25, 2011. On November 3, 2011, a Jeff Davis County grand jury indicted Carter, charging him with malice murder, two counts of felony murder, aggravated assault, cruelty to children in the first degree, concealing the death of another, and the unlawful possession of a firearm during the commission of a felony. His trial began on November 26, 2012, and the jury returned its verdict on November 29, finding him guilty on all counts. The trial court sentenced Carter to imprisonment for life without parole for malice murder, a consecutive term of imprisonment for 20 years for cruelty to children, a consecutive term of imprisonment for ten years for concealing the death of another, and a

1. Viewed in the light most favorable to the verdicts, the evidence shows that Carter fatally shot Johnson on September 25, 2011. Johnson was 15 years of age, and he was the son of a woman with whom Carter had been involved in a romantic relationship. About a week before Johnson was killed, his mother broke off her relationship with Carter, expressing a desire to devote more time to Johnson. Carter claimed that he took Johnson into the woods on September 25 to let Johnson shoot a rifle. As Carter was holding the rifle, he said, Johnson turned toward him and said something that surprised Carter, which caused Carter to accidentally discharge the rifle, fatally shooting Johnson. Carter then buried Johnson's body and told no one about what had happened until October 5. At trial, Carter presented a defense of accident, but his claim that Johnson turned toward him before he fired the fatal shot was belied by the medical evidence, which showed that Johnson was shot in the back. In any event, it was

consecutive term of imprisonment for five years for the possession of a firearm during the commission of a felony. The aggravated assault merged into the malice murder, and the felony murder counts were vacated by operation of law. See Malcolm v. State, 263 Ga. 369, 372-373 (4), (5) (434 SE2d 479) (1993). On December 28, 2012, Carter filed a motion for new trial, and he amended the motion on February 10, 2016 and April 13, 2016. The trial court denied the motion for new trial on September 6, 2016, and Carter timely filed a notice of appeal that same day, and he amended it on September 19, 2016. This case was docketed to the August 2017 term of this Court and submitted for a decision on the briefs.

for the jury to consider the credibility of Carter's claim that the shooting was accidental. See Morrison v. State, 300 Ga. 426, 427 (1) (796 SE2d 293) (2017). We conclude that the evidence authorized the jury to find beyond a reasonable doubt that Carter was guilty of the crimes of which he was convicted. See Jackson v. Virginia, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).[2]

2. Carter claims that the trial court erred when it struck two prospective jurors and when it refused to strike a third. Whether to strike a juror for cause is a matter committed to the sound discretion of the trial court, and we will not find error in an exercise of that discretion absent a showing that the discretion was manifestly abused. See Gray v. State, 298 Ga. 885, 887 (2) (785 SE2d 517) (2016). We see no abuse of discretion here.

The trial court struck the first prospective juror on its own motion after the court determined that the prospective juror no longer resided in Jeff Davis County. Under OCGA § 15-12-163 (b) (1), a person who is "not a citizen, resident in the county," is not qualified to sit as a juror and may be struck for cause. And a trial court does not abuse its discretion when it excuses an

---

[2] For the same reasons, we reject Carter's claim that the trial court erred when it failed to direct a verdict of acquittal. See Lewis v. State, 296 Ga. 259, 261 (3) (765 SE2d 911) (2014).

unqualified juror on its own motion. See Norris v. State, 250 Ga. 38, 39 (1) (295 SE2d 321) (1982). Here, the prospective juror testified that he was living in Appling County, that he was continuing to store some of his possessions in Jeff Davis County only because he had not yet secured permanent housing in Appling County, and that he intended to live permanently in Appling County. The trial court did not abuse its discretion when it determined that the prospective juror was not a resident of Jeff Davis County.

The second prospective juror in question had a close relationship with Carter's son and expressed an inability to render an unbiased verdict, and he was struck upon the motion of the State. This prospective juror testified that his daughter and Carter's son had dated for at least four years, and he explained that Carter's son had lived with his family and was like a son to him. He felt that his relationship with Carter's son would be a "problem" if he sat on the jury, that his mind was "halfway made up" before he heard any evidence, that he had formed an opinion about Carter's guilt, that he did not think there was "any way . . . that [he] could come to . . . an unbiased conclusion," that he would not be able to make a decision in the case based solely upon the evidence, and that — if he were Carter — he would not want someone who knew what he knew to

4

serve on the jury in any event. The trial court did not err when it struck this prospective juror for cause. See Krause v. State, 286 Ga. 745, 748 (3) (691 SE2d 211) (2010).

Carter sought to exclude the third prospective juror based upon the juror's relationship with numerous witnesses and the fact that he, at one point during voir dire, said that he thought Carter should be required to prove his innocence. But this prospective juror agreed that anything he had heard about the case in the community was not evidence, said that he had not formed an opinion about the case, assured that he would "try to" make a decision based solely on what was proven in court, and said that he would "have to be fair" to Carter. As to his statement that Carter should have to prove his innocence, the juror clarified that he didn't "know . . . how this court system works," and when the trial court explained that the law was that "he's innocent until proven guilty," the prospective juror responded that he understood and agreed. "The trial court was particularly well suited to determine if the prospective juror was merely confused about the burden of proof and capable of rehabilitation, on the one hand, or biased against [Carter] in a way that could not be cured, on the other." Gray, 298 Ga. at 888 (2). The trial court acted within its discretion when it

found that the prospective juror did not have a fixed opinion about Carter's guilt or innocence and that he "had only been confused about the burden of proof, and it did not err when it refused to strike the prospective juror for cause." Id.

3. Carter asserts that the trial court erred when it admitted evidence of pretrial statements that he made on October 5 and October 12, 2011. These statements were the subject of a Jackson-Denno hearing,[3] at which it was revealed that Carter was first interviewed on October 4 after being arrested on an unrelated charge. At that time, investigators read the Miranda warnings[4] to Carter, and in the course of the interview that followed, Carter identified his red Chevrolet Beretta in a photograph that investigators showed him. This photograph was taken from a video recording that showed Carter picking up Johnson from his home around noon on September 25. After the investigators concluded their interview of Carter, they allowed him to meet with Johnson's mother in the interrogation room. Johnson's mother reminded Carter that she knew that he had picked up Johnson from their home on September 25, and she repeatedly asked Carter to tell her where he had taken her son. About halfway

---

[3] See Jackson v. Denno, 378 U. S. 368 (84 SCt 1774, 12 LE2d 908) (1964).

[4] See Miranda v. Arizona, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

through their 26-minute conversation, Johnson's mother told Carter that he was "not going to get out of here until . . . you tell us where [Johnson's] at."

The next day, police officers drove Carter to Dublin, and he spontaneously told them that Johnson was dead and that they should drive him back to Hazlehurst so he could show them Johnson's body. The officers again read the <u>Miranda</u> warnings to Carter, and he subsequently led them to the shallow grave in which he had buried Johnson. Carter claims that the incriminating statements that he made on October 5, and additional statements that he made on October 12, were improperly induced by the "threat" made by Johnson's mother on October 4 about him not "get[ting] out" until he told her where he had taken Johnson.

Former OCGA § 24-3-50, which was effective as of the time of Carter's trial,[5] provided that, "[t]o make a confession admissible, it must have been made voluntarily, without being induced by another by the slightest hope of benefit or remotest fear of injury."[6] The trial court found by a preponderance of the

---

[5] The provisions of former OCGA § 24-3-50 were carried forward into the new Evidence Code, and they now are codified at OCGA § 24-8-824.

[6] Although the statute uses the term "confession," "[i]t has long been the law in this State that the rule as to the admissibility of an incriminatory statement is the same as that

evidence that Carter's statements were voluntarily made (and not improperly induced by anything said to him by Johnson's mother). That finding was not clearly erroneous. See Sosniak v. State, 287 Ga. 279, 279-280 (1) (695 SE2d 604) (2010).

The conversation between Carter and Johnson's mother was recorded and viewed by the trial court. Her statement about Carter not getting out of jail was a small part of a 26-minute conversation, in which she repeatedly asked Carter to tell her where he took her son after picking him up from their home. Carter does not point to any evidence indicating that he was threatened by the statement that Johnson's mother made, that he believed she had any power to prevent him from getting out of jail, or that she was acting as an agent of the State when she made that statement. And Carter acknowledges that he did not make any incriminating statements on October 4 after speaking with Johnson's mother.

There also does not appear to be any connection between the conversation with Johnson's mother on October 4 and Carter's incriminating statements on

applied to a [full] confession." Vergara v. State, 283 Ga. 175, 177 (1) (657 SE2d 863) (2008). See also State v. Chulpayev, 296 Ga. 764, 771 (2) (770 SE2d 808) (2015) (finding that the same rule applies to OCGA § 24-8-824 under the new Evidence Code.).

8

October 5 and 12. Instead, the undisputed evidence is that the police officers who were with Carter on October 5 had not asked him any questions about the case either before, during, or after their drive to Dublin, that he had been waiting in the lobby of a Georgia State Patrol post in Dublin for about ten minutes when he asked one of the officers if he could speak to him outside, and that Carter then told the officer that "you guys have been real good to me, just bring me back to Hazlehurst and I'll take you to where [Johnson] is." The police officer then read the <u>Miranda</u> warnings to Carter, and the remaining conversations between the police officers and Carter were recorded and reviewed by the trial court. Similarly, Carter was read the <u>Miranda</u> warnings again on October 12, his interview with investigators on that day was recorded, and the trial court reviewed that recording too. Nothing in those recordings suggests that Carter was concerned about the "threat" made by Johnson's mother on October 4, he repeatedly acknowledged that he had not been threatened to make a statement, and the trial court did not err when it found that his statements were voluntarily made as required by former OCGA § 24-3-50.

4. Finally, Carter contends that the trial court erred when it allowed Johnson's mother to testify about text messages that she said she had received

9

from Carter during the time that Johnson's whereabouts were unknown. According to Johnson's mother, Carter's text messages invited her on dates and explained why he was not participating in the search for Johnson. This testimony was properly admitted under the "[a]dmissions by a real party in interest" exception to the hearsay rule under former OCGA § 24-3-34.[7] Johnson's mother also provided evidence that identified Carter as the person who sent the text messages at issue: she had been involved in a romantic relationship with him for around eight months, she had saved his phone number in her "contacts" under his name, and the messages included information that was known to Carter (and not many other people) that identified him as the sender of the messages. Cf. Brown v. State, 266 Ga. 723, 725 (3) (470 SE2d 652) (1996) ("Georgia law requires that there be a sufficient basis for a witness to identify a person with whom he spoke over the telephone, before testifying as to the contents of the conversation.").[8] Carter was free to cross-examine Johnson's mother about the possibility that someone else sent the text messages

---

[7] We note that admissions of a party opponent are admissible under the new Evidence Code. See OCGA § 24-8-801 (d) (2).

[8] The rules for authentication or identification under the new Evidence Code are found in OCGA § 24-9-901.

10

(although he did not do so), and the trial court did not abuse its discretion when it permitted her testimony. See id.

Judgment affirmed. All the Justices concur.

Decided December 11, 2017.

Murder. Jeff Davis Superior Court. Before Judge Kelley.

Jonathan P. Lockwood, for appellant.

Jacquelyn L. Johnson, District Attorney, Andrew J. Ekonomou, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Matthew M. Youn, Assistant Attorney General, for appellee.