304 Ga. 51
FINAL COPY

S18A0640.  CALDWELL v. THE STATE.

HINES, Chief Justice.

Walter Caldwell appeals his conviction and sentence for felony murder while in the commission of aggravated assault in connection with the beating death of his girlfriend's fifteen-month-old daughter Tynisha Carlton.  His sole challenge is to the trial court's refusal to strike three potential jurors for cause.  Finding the challenge to be without merit, we affirm.[1]

The evidence construed in favor of the verdicts showed the following.  On March 2, 2009, Caldwell was living with Mildred Carlton and her baby daughter

---

[1] The murder occurred on March 2, 2009.  On May 29, 2009, a Fulton County grand jury returned a five-count indictment against Caldwell: Count 1 — malice murder; Count 2 — felony murder while in the commission of aggravated assault; Count 3 — felony murder while in the commission of cruelty to children in the first degree; Count 4 — aggravated assault; and Count 5 — cruelty to children in the first degree.  Caldwell was tried before a jury October 24-27, 2011, and found guilty of Counts 2, 3, 4, and 5; the jury was unable to reach a verdict on Count 1, and the trial court declared a mistrial as to that count.  On October 28, 2011, Caldwell was sentenced to life in prison on Count 2.  The trial court ruled that the remaining guilty verdicts merged for the purpose of sentencing, and the rulings have not been challenged.  See *Dixon v. State*, 302 Ga. 691, 697-698 (4) (808 SE2d 696) (2017).  An order of nolle prosequi was entered on Count 1.  A motion for new trial was filed on November 23, 2011, and an amended motion for new trial was filed on May 13, 2016.  The motion for new trial, as amended, was denied on May 25, 2016.  A notice of appeal was filed on June 23, 2016, and the case was docketed to the April 2018 term of this Court.  The appeal was submitted for decision on the briefs.

Tynisha in an apartment in Fulton County. That day Carlton left Tynisha in Caldwell's care while she went to work for the day; only Caldwell and Tynisha were in the apartment. Carlton returned to the apartment around 11:00 or 11:30 p.m. The apartment door was unlocked, and the only occupant was Tynisha. Carlton checked on Tynisha and initially believed that she was asleep in her bed but upon closer inspection noticed "two dark spots" on Tynisha's neck, and when she felt Tynisha's body, it was hard. Carlton immediately summoned a friend to come check on the baby. The friend came into the room and grabbed Tynisha's arm, but Tynisha's whole body lifted with her arm; he told Carlton that he believed Tynisha was dead. Carlton called the police, and responders determined that the baby was indeed dead. A responding detective noticed that the child had sustained trauma to her head, right side of her face, neck, scalp, and lips.

The following morning, and after Carlton had given a statement to police, Caldwell called Carlton from a payphone in the Albany area. Caldwell stated "by now you know that she's dead." When Carlton asked what had happened, Caldwell stated that the television had fallen on Tynisha, he got the television off of her, put some Neosporin on her, and rocked her to sleep. He further stated

2

that Tynisha woke up and started crying and would not stop, and all he could remember was putting his hands around her throat. Carlton went to the police department to tell them about the call from Caldwell. While she was speaking to a detective, Caldwell telephoned her again. Carlton put her cell phone on speaker so that the detective could hear the conversation. Caldwell stated the television had fallen on the baby but that was not what killed her; he admitted he choked the child and apologized. Caldwell asked Carlton to wire him money so that he could return to Atlanta and turn himself in.

Following the money wire, Caldwell asked Carlton to meet him at Underground Atlanta to talk. Carlton informed police of the planned meeting so that they could arrest Caldwell. When Carlton and Caldwell began to leave Underground Atlanta, Carlton waved down police. Caldwell walked over to the police car and stated, "I killed her child last night." He was transported to the police station; there he waived his *Miranda*[2] rights and made a statement. Caldwell denied striking Tynisha, stated the television fell on her, and that he "blacked out"; he admitted to choking Tynisha but believed she was still alive after he choked her.

---

[2] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

The medical examiner determined that Tynisha had bruises to her face and head; hemorrhaging under her eyelid, in the left eye, and in her cheeks and tongue muscles; bruising to her right ear which extended five inches into her scalp in a pattern; hemorrhaging in the scalp and muscle behind the right ear; swelling to the brain; bruising to the torso; hemorrhaging in the abdominal cavity; tears in the heart in multiple places; bruised right lung; tears in the liver; broken ribs; hemorrhaging around and inside the kidneys and small intestines; and bruising to the legs. The hemorrhaging in the cheeks, eye, eyelid, and tongue muscles were consistent with choking. The injuries to the head and ears were consistent with being struck with a closed fist or shoe-clad foot. Some of the injuries could be consistent with a television falling on the chest, but the injuries to the head and the fact that there were injuries on the front, back, right, and left sides of the body were inconsistent with a television falling on the child and were consistent with multiple blows and/or striking something. The cause of death was blunt force injuries to the torso, namely to the heart and liver, which were more immediately fatal than the brain swelling. If the child was left untreated, death would have occurred within hours; but, if emergency personnel had been contacted and treatment given, it was possible Tynisha could have

4

survived.

1. Caldwell does not challenge the legal sufficiency of the evidence of his guilt. Nevertheless, in accord with this Court's general practice in appeals of murder cases, we have reviewed the record and conclude that the evidence at trial was sufficient to enable a rational trier of fact to find Caldwell guilty beyond a reasonable doubt of the crime of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. During jury selection, Caldwell moved unsuccessfully to have prospective Jurors 12, 31, and 35 removed for cause. The trial court found that even though the objected-to members of the venire said that it might be difficult, they would try to be fair and do their best. It appears that prospective Jurors 12 and 35 were peremptorily stricken from the panel, and that Juror 31 was selected as an alternate but did not serve on the jury. Caldwell argues that the record on voir dire demonstrates that all three individuals indicated they could not be fair and were not rehabilitated, and even if they were, the rehabilitation was accomplished by improper leading questions from the State.

First, the trial record fails to disclose how, when, or by whom prospective

5

Jurors 12 and 35 were struck from the panel.[3]

> It is true that defendants are not required to exhaust their peremptory strikes as a condition of establishing harm. But if the prospective juror is removed without any use of peremptory strikes by the defense, as where the State exercises a peremptory strike to remove the juror, any error in the trial court's refusal to strike the juror for cause is harmless because the removal of the juror did not cost the defense any peremptory strike.

*Nwakanma v. State*, 296 Ga. 493, 500 (5) (768 SE2d 503) (2015) (citations omitted). Inasmuch as Caldwell has failed to demonstrate from the trial record that prospective Jurors 12 and 35 were struck from the panel through his, rather than the State's, exercise of peremptory strikes, he has not established any harm from the trial court's refusal to strike those prospective jurors for cause. Id.

In any event, even assuming that the exercised peremptory strikes were

---

[3] The only inkling of the circumstances of the exercise of the peremptory strikes in question is during argument at the hearing on the amended motion for new trial in regard only to prospective Juror 35. In a colloquy between the trial court and defense counsel, who did not try the case, the trial court stated that it assumed that such juror was "probably excused by the defense," and counsel responded "correct."

Caldwell's, his claims regarding these prospective jurors as well as Juror 31 fail on the merits. As for Juror 31, any error in her qualification would not be harmful inasmuch as she did not serve on the jury. *Heidler v. State*, 273 Ga. 54, 57 (3) (c) (537 SE2d 44) (2000) (no harmful error in the qualification of alternate jurors when no alternate jurors were needed during the trial). In regard to all three individuals, the decision to strike them for cause was a matter within the sound discretion of the trial court, and this Court will not find error in the exercise of that discretion absent a showing that the discretion was manifestly abused. *Carter v. State*, 302 Ga. 685, 686 (2) (808 SE2d 704) (2017). Indeed, this Court will not substitute its own findings for that of the trial court; we are to pay deference to the trial court's determinations, including its resolution of any equivocations and conflicts in the prospective juror's responses on voir dire. *Thorpe v. State*, 285 Ga. 604, 606 (3) (678 SE2d 913) (2009). And, in order for a prospective juror to be excused for cause, the movant must show that the juror holds such a fixed and definite opinion of the guilt or innocence of the defendant that he or she will not be able to set such opinion aside and decide the case based upon the evidence and the court's instructions regarding it. Id. There is no requirement to strike a juror just because the juror expresses some doubt

about his or her impartiality. *Kass v. State*, 297 Ga. 153, 155 (2) (771 SE2d 873) (2015). What is more, the determination of whether a prospective juror is qualified to serve on the jury must be based upon consideration of the voir dire as a whole. *Thorpe v. State*, supra at 606 (3).

Examination of the totality of the voir dire of prospective Jurors 12, 31, and 35 reveals that during the general questions the panel was asked if because of the nature of the alleged crimes on trial, anyone would be unable to fairly and objectively hear the case, and none of the members of the venire, including the individuals now challenged, responded in the affirmative. Furthermore, during individual voir dire, while the subject jurors related some circumstances and reservations raising the possibility of bias, each juror also expressed the willingness to be fair and impartial. As has been noted, it was for the trial court to resolve any equivocal or conflicting responses given during voir dire. *Thorpe v. State*, supra at 606 (3). Regarding the claim that the trial court's ultimate determination was the result of the State's improper use of leading questions during the voir dire, the record discloses that Caldwell never objected to the State's voir dire questions as improper. *Kass v. State*, supra at 155 (2). In fact, when asked by the trial court following jury selection if there were any

issues with respect to the selection process, the defense responded "no."

Simply, there is no showing that the trial court manifestly abused its discretion in refusing to excuse the challenged jurors for cause. *Carter v. State*, supra at 686 (2).

Judgment affirmed. All the Justices concur.

Decided June 18, 2018.

Murder. Fulton Superior Court. Before Judge Shoob.

Kenneth D. Kondritzer, for appellant.

Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, David K. Getachew-Smith, Sr., Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Ashleigh D. Headrick, Assistant Attorney General, for appellee.