309 Ga. 447
FINAL COPY

S20A0583.  STEPHENS v. THE STATE.

Melton, Chief Justice.

Following a jury trial, Lajuante Stephens appeals his convictions for malice murder and related offenses, contending that the trial court erred by striking a particular juror for cause.[1] For the

---

[1] On October 26, 2016, Stephens, along with co-defendants Damien Durrell Heard, Jamarcus Antonio Woodall, and Alfred Desean Smith, was indicted for the following crimes in connection with the April 4, 2013 shooting death of James Daniel Evers: malice murder (Count 1), felony murder (Count 2), five counts of aggravated assault (Counts 3, 7, 8, 10, and 12), four counts of possession of a weapon during the commission of a crime (Counts 4, 9, 11, and 13), false imprisonment (Count 5), and armed robbery (Count 6). Stephens was tried separately from his co-defendants. At a jury trial ending on June 18, 2018, Stephens was found guilty on all counts. Thereafter, the trial court sentenced Stephens to life imprisonment without parole for malice murder (Count 1), five years for possession of a weapon during the commission of a crime (Count 4), ten years for false imprisonment (Count 5), life imprisonment with the possibility of parole for armed robbery (Count 6), 20 years for one count of aggravated assault (Count 10), and 20 years for a second count of aggravated assault (Count 12), all to be served consecutively. The trial court merged Counts 7 and 8 with Count 6 and merged Counts 9, 11, and 13 with Count 4. Count 2, felony murder, was vacated by operation of law. *Malcolm v. State*, 263 Ga. 369 (4) (434 SE2d 479) (1993). Stephens timely filed a motion for new trial on June 19, 2018. Following a substitution of counsel, Stephens filed an amended motion for new trial on March 13, 2019. The trial court denied the motion on April 22, 2019. Stephens timely filed a notice of appeal on May 8,

reasons set forth below, we affirm.

1. Viewed in the light most favorable to the verdicts, the evidence presented at trial showed that, on April 4, 2013, Donald Evers was working inside a shed on his property in Clayton County when someone came up behind him and put a gun to the back of his head. The armed man ordered Donald to turn around and look at him. Donald saw that the armed man was black, approximately 5′6″ tall, and his hair was spiked in "checkerboard" pattern twists. Another man then approached Donald from behind and took Donald's wallet and cell phone. The two assailants demanded to know which doors to Donald's house were unlocked, how many people were inside, and the location of money and drugs. Donald lied to the men, telling them that he was merely a handyman who worked for the owner of the house, and that he did not know the answers to the questions. The assailants then bound Donald with

2019, and an amended notice of appeal on June 3, 2019. His case was then docketed to the April 2020 term of this Court and submitted for decision on the briefs. We note that we recently considered the appeal of co-defendant Heard, who was tried separately. See *Heard v. State*, ___ Ga. ___ (844 SE2d 791) (2020).

duct tape, forced him to lie on the ground, and covered him with a detached car hood they found in the shed. While being bound, Donald observed that the second man was also black, but "meatier" and "bigger." As he was being covered with the car hood, Donald saw that a third man was also present, and he heard that man talking to a fourth person over a cell phone.

Donald testified he was trapped under the car hood for at least 25 minutes. At that point, he heard a gunshot followed by two more gunshots 15 to 20 seconds later. Donald heard footsteps, running, and then someone "hit the fence." Rolling from under the car hood, Donald moved on his knees back toward the house and discovered the body of his son, James Daniel Evers (Daniel), who had been shot to death.

After arrests for the murder had been made, Donald attended a May 2013 bond hearing for one of the suspects. At that hearing, he immediately recognized Stephens as the assailant who pointed a handgun at Donald's head. Donald's ex-wife was present at this bond hearing and later testified that Donald told her that he recognized

Stephens at the bond hearing.

Charles David Emmons, Daniel's friend, testified at trial that, on the day of Daniel's murder, he was at the Everses' home. Shortly before the murder, Daniel asked his girlfriend, Ashley Baxley, and Emmons about a green Mountaineer SUV parked by a deer processing business next door that was closed at that time. Emmons and Baxley testified that Daniel was upset because someone had been driving a four-wheeler through his yard and was leaving tracks in the grass. Daniel pulled his black Yukon SUV to the end of the driveway, left the Yukon running, and told Emmons he was going to talk to the four-wheeler driver about the damage to the grass. Emmons stood near the Yukon and watched Daniel walk down the driveway toward the processing shop until he disappeared out of sight. Baxley remained in the front passenger's seat of the Yukon.

Shortly thereafter, Emmons and Baxley heard a gunshot. Emmons ran down the driveway toward the shop when "a black gentleman r[a]n across the drive[way] . . . and started firing at [him]." The man who was shooting at Emmons was wearing a blue

and white North Carolina Tarheels hoodie and had dark skin, a big nose, and twists in his hair. Emmons ran back up the driveway and jumped in the driver's seat of the Yukon, speeding away with Baxley. The assailants pursued in the green Mountaineer SUV for a brief period of time.

John Elledge, Jr., an acquaintance of Daniel, testified that he knew Daniel through mutual friends. On the day of the murder, Elledge was giving Christy Oliver a ride to the Everses' home. Seconds before the shooting, Elledge and Oliver pulled into the parking lot of a convenience store directly across the street from the Everses' house. Oliver looked over to the Everses' place and saw Emmons standing next to Daniel's black Yukon in the driveway. Oliver also noticed a green SUV parked over by the deer processing plant next door. In addition, Oliver testified she noticed one of Stephens's co-defendants, Damien Heard, whom she knew from the neighborhood, standing near the convenience store. Oliver went inside the store, and, when she returned, she and Elledge heard gunshots coming from the Everses' home. Oliver testified that, after

the gunshots, the black Yukon sped away. At the same time, Oliver saw three black males race up from the wood line, where the Everses' shed was located, and clear the fence. One of the three men had a "long barrel gun," one had long dreads, and one had little "twists" covering his head. All three men got in the green SUV and drove after the black Yukon.

Investigators subsequently recovered the green Mountaineer, which had been set on fire and abandoned. Investigation revealed that the Mountaineer had been stolen from Talona Henry, who lived at the Four Seasons Apartments. Henry's boyfriend, Sharrieff Clarke, testified he learned that "Smurf," whom he had known for years and identified as Stephens, another young man known as "Man-Man," the nickname of co-defendant Alfred Smith, and "Jamarcus," referring to co-defendant Jamarcus Woodall, were responsible for the theft of Henry's SUV. In a statement made before trial, Clarke indicated that he had seen the men standing in the vicinity of the Mountaineer prior to its theft. Clarke further testified that he confronted Stephens about the theft, and, in the same

statement made before trial, Clarke indicated that Stephens admitted participation in the theft.

Further evidence showed that, ten days before the murder while Daniel was preparing to go on vacation, Daniel had been in possession of approximately $17,000 in cash. The night before Daniel left, co-defendant Heard came by the Everses' house. Heard and the victim argued over money Heard owed to Daniel while Daniel's money was sitting out on a pool table.

Shell casings recovered from the murder scene were matched by a ballistics expert to a shell casing from a shooting that occurred at the Four Seasons Apartments two days before Daniel was shot. The person injured in that shooting, Jamari Worthy, testified that, after accidentally shooting himself, he had passed the gun to Stephens, whom Worthy also knew as "Smurf." Then, all of the occupants of the apartment, which included co-defendants Smith and Woodall, ran away, and the gun was taken with them. After the murder, Stephens told Worthy he used that same gun to shoot someone in a shed in Clayton County, and he volunteered that the

stolen getaway vehicle had been set on fire. In addition, cell phone evidence revealed both that Stephens and Heard were in constant contact at the time of the murder and that Stephens was in the vicinity of the Everses' home when the murder occurred.

Although Stephens does not challenge the sufficiency of the evidence, in accordance with our customary practice in murder cases,[2] we have nonetheless reviewed the evidence presented at trial and conclude that it was sufficient to enable the jury to find Stephens guilty beyond a reasonable doubt for the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. In his sole enumeration of error, Stephens contends that the trial court erred by striking for cause Juror 30, arguing that there was inadequate evidence that Juror 30 was a convicted felon whose rights had not been restored. We disagree.

---

[2] We remind litigants that the Court will end its practice of considering sufficiency sua sponte in non-death penalty cases with cases docketed to the term of court that begins in December 2020. See *Davenport v. State*, ___ Ga. ___ (___ SE2d ___) (2020). The Court began assigning cases to the December Term on August 3, 2020.

Prior to trial and its associated voir dire, the State conducted criminal background checks on all prospective jurors by submitting their names to the FBI. In instances where FBI records indicated that any prospective juror had a criminal record, the State then ran checks of both federal and state databases to uncover criminal records. With regard to Juror 30, the State found a Florida felony conviction matching the juror's name. The birthdate contained in the Florida records matched the month and day of Juror 30's birth, but the birth year was off by one year from the year that Juror 30 gave when being questioned during voir dire. Some of the physical descriptions contained in the Florida records corresponded to Juror 30, though Stephens contended that the height contained therein did not match Juror 30. The State, however, maintained that the height discrepancy was insignificant.[3] Under examination, Juror 30 denied that he had a felony conviction in Florida, but admitted that

---

[3] The height listed on the Florida felony conviction was 5′7″, but Stephens's trial counsel argued that Juror 30 was at least 6′ tall. To support this argument, trial counsel stated that Juror 30 was taller than trial counsel, but no actual measurements were provided.

he had been to Florida at some point.

Following the presentation of this evidence during voir dire, the State moved to dismiss Juror 30 on the basis that he was a convicted felon and he failed to disclose that status. See OCGA § 15-12-163 (b) (5) (providing that, in jury trials in felony cases, either the State or the accused may object to the seating of a juror who is a convicted felon and whose civil rights have not been restored). Stephens objected and argued that Juror 30 could not be struck for cause because the birth year listed on the felony conviction was off by one year and the height contained in the Florida records was inaccurate. The trial court rejected Stephens's contentions and found sufficient cause to strike Juror 30.

Striking a juror for cause is a "matter committed to the sound discretion of the trial court," and no error will be found "absent a showing that the discretion was manifestly abused." *Carter v. State*, 302 Ga. 685, 686 (2) (808 SE2d 704) (2017). "An appellate court must pay deference to the finding of the trial court and this deference includes the trial court's resolution of any equivocations or conflicts

in the prospective juror's responses on voir dire." *Nance v. State*, 280 Ga. 125, 128 (7) (623 SE2d 470) (2005). Giving such deference to the trial court in this case, we conclude that the trial court did not abuse its broad discretion in deciding that Juror 30 should be struck for cause.

Moreover, even if Stephens could show that the trial court erred in some way, "'[t]he erroneous allowing of a challenge for cause affords no ground of complaint if a competent and unbiased jury is finally selected.'" (Citation omitted.) *Wells v. State*, 261 Ga. 282, 282-283 (2) (404 SE2d 106) (1991). Stephens has not even attempted to show that his actual jury was not competent and unbiased.

*Judgment affirmed. All the Justices concur.*

DECIDED AUGUST 10, 2020.
Murder. Clayton Superior Court. Before Judge Collier.
*Juwayn Haddad*, for appellant.
*Tasha M. Mosley, District Attorney, Jeffrey M. Hawkins, Elizabeth A. Baker, Christopher D. Sperry, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Mark S. Lindemann, Assistant Attorney General*, for appellee.